IN RE APPLICATION OF COLUMBUS SOUTHERN POWER COMPANY FOR
ADMINISTRATION OF THE SIGNIFICANTLY EXCESSIVE EARNINGS TEST;
OHIO ENERGY GROUP ET AL., APPELLANTS AND CROSS-APPELLEES;
COLUMBUS SOUTHERN POWER COMPANY, APPELLEE AND CROSS-APPELLANT;
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *In re Application of Columbus S. Power Co.,* 134 Ohio St.3d 392,
2012-Ohio-5690.]

*Public utilities—Electric distribution companies operating under electric security*
*plans—R.C. 4128.143(F)—Standard of "significantly excessive earnings"*
*not void for vagueness—Treatment of off-system sales and associated*
*assets.*

(No. 2011-0751—Submitted March 21, 2012—Decided December 6, 2012.)

APPEALS and CROSS-APPEAL from the Public Utilities Commission of Ohio,
No. 10-1261-EL-UNC.

————————————

**CUPP, J.**

**{¶ 1}** Electric distribution utilities that opt to provide service under an electric security plan ("ESP") must undergo an annual earnings review. If their plan resulted in "significantly excessive earnings" compared to similar companies, the utility must return the excess to its customers. R.C. 4928.143(F). In the case below, the Public Utilities Commission found that Columbus Southern Power's 2009 earnings were significantly excessive by over $42 million.

**{¶ 2}** There are three appeals from the order. Columbus Southern Power ("CSP") asserts that R.C. 4928.143(F) is unconstitutionally vague, and the Ohio Energy Group and the Office of the Ohio Consumers' Counsel (collectively, "OEG") and Industrial Energy Users-Ohio ("IEU") raise different arguments that

the commission erred in applying the statute. After careful review of these appeals, we find merit in none of the arguments, and we affirm.

**Factual and Procedural Background**

{¶ 3} Ohio requires electric distribution utilities to provide consumers with "a standard service offer of all competitive retail electric services necessary to maintain essential electric service to consumers, including a firm supply of electric generation service." R.C. 4928.141(A). "The utility may provide the offer in one of two ways: through a 'market rate offer' under R.C. 4928.142 or through an 'electric security plan' under R.C. 4928.143." *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 5. The American Electric Power operating companies, CSP and Ohio Power, chose to provide service under an ESP.

{¶ 4} The statute does not provide a detailed mechanism for establishing rates under an ESP. Plans may contain any number of provisions within a variety of categories so long as the plan is "more favorable in the aggregate" than the expected results of a market-rate offer. R.C. 4928.143(C)(1). But the statute does contain some limits, one of which is at issue in this case.

{¶ 5} R.C. 4928.143(F) requires the commission annually to consider whether the ESP resulted in "significantly excessive earnings" compared to companies facing "comparable" risk:

> With regard to the provisions that are included in an electric security plan under this section, the commission shall consider, following the end of each annual period of the plan, if any such adjustments resulted in excessive earnings as measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly

2

traded companies, including utilities, that face comparable business and financial risk, with such adjustments for capital structure as may be appropriate. Consideration also shall be given to the capital requirements of future committed investments in this state.

{¶ 6} The utility bears the "burden of proof for demonstrating that significantly excessive earnings did not occur." *Id.* If the commission "finds that such adjustments, in the aggregate, did result in significantly excessive earnings, it shall require the electric distribution utility to return to consumers the amount of the excess by prospective adjustments." *Id.*

{¶ 7} In the case below, the commission reviewed the companies' 2009 earnings. The companies had proposed to exclude from review certain revenue from "off-system sales," that is, wholesale sales by the companies to nonretail customers. Several intervenors opposed the companies' analysis. OEG argued that the statute did not permit the commission to exclude any earnings from review. IEU, in contrast, argued that many more items of revenue should have been excluded. And CSP and Ohio Power argued that the statute requiring earnings review was unconstitutionally vague.

{¶ 8} The commission rejected all of these challenges. On the merits, the commission eliminated the off-system-sales revenue from review. Pub. Util. Comm. No. 10-1261-EL-UNC (Jan. 11, 2011) (the "order") at 27-30. After making this adjustment, it found that Ohio Power "did not have significantly excessive earnings." *Id.* at 35. CSP, on the other hand, was found to have had over $42 million in significantly excessive earnings. *Id.*

{¶ 9} IEU and OEG appealed, and CSP filed a cross-appeal. The Ohio Partners for Affordable Energy filed an amicus brief, as did the FirstEnergy operating companies.

## Discussion

**{¶ 10}** This case presents three separate appeals. CSP raises a constitutional, void-for-vagueness challenge; OEG and IEU raise different arguments, each asserting that the commission misapplied the statute. We consider CSP's constitutional argument first.

## CSP's Argument

**{¶ 11}** CSP offers a single argument for overturning the order—that the statute requiring earnings review, R.C. 4928.143(F), is unconstitutionally vague. According to CSP, that section "fails to provide electric distribution utilities with fair notice, or the commission with meaningful standards, as to what is meant by 'significantly excessive earnings.' " CSP is incorrect, and we hold that the statute is constitutional.

## I. Standard of review

**{¶ 12}** First, as a general matter, CSP bears a heavy burden of proof in challenging the constitutionality of an Ohio statute. CSP must establish beyond a reasonable doubt that the statute is unconstitutional. *Arnold v. Cleveland*, 67 Ohio St.3d 35, 38–39, 616 N.E.2d 163 (1993).

**{¶ 13}** CSP's vagueness challenge faces an uphill climb for another reason. Tolerance for vagueness "depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Some statutes trigger relatively strict vagueness review, such as eminent-domain statutes, *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 88, statutes imposing criminal sanctions, *Roark & Hardee L.P. v. Austin*, 522 F.3d 533, 552 (5th Cir.2008), and statutes implicating constitutionally protected rights, *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 42.

{¶ 14} In contrast, "laws directed to economic matters are subject to a less strict vagueness test than laws interfering with the exercise of constitutionally protected rights." *Id.*; *see also, e.g.*, *Hoffman Estates*, 455 U.S. at 498 ("economic regulation is subject to a less strict vagueness test * * *"). That is, a "greater degree of ambiguity will be tolerated in statutes which * * * merely impose civil, as opposed to criminal penalties" and "when the statute regulates the conduct of businesses." *Big Bear Super Market No. 3 v. Immigration & Naturalization Serv.*, 913 F.2d 754, 757 (9th Cir.1990). *Compare United States v. Dimitrov*, 546 F.3d 409, 414 (7th Cir.2008) (upholding a statute imposing criminal sanctions when a defendant "operated his business in a highly regulated industry").

{¶ 15} R.C. 4928.143(F) is a civil statute directed to economic matters in a highly regulated industry, and it does not implicate any constitutionally protected conduct. Therefore, we apply a less strict vagueness test.

{¶ 16} CSP rejoins that *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, requires heightened scrutiny here because this case involves "the taking of private property rights." We did not formulate our holding in *Norwood* so broadly, however. We held that heightened scrutiny applies "when a court reviews an eminent-domain statute or regulation." *Id*. at ¶ 88. CSP makes no express argument that R.C. 4928.143(F) qualifies as "an eminent-domain statute."

{¶ 17} *Norwood* does not require heightened scrutiny here. In that case, we analyzed a law providing for the physical appropriation of real estate for public use, not a law (like this one) that imposes a monetary assessment. Whether such a law causes a taking is a difficult question, and CSP does not address it. *See, e.g.*, *McCarthy v. Cleveland*, 626 F.3d 280, 285 (6th Cir.2010) ("all circuits that have addressed the issue have uniformly found that a taking does not occur when the statute in question imposes a monetary assessment that does not affect a specific interest in property"); *see also Swisher Internatl., Inc. v. Schafer*, 550

F.3d 1046, 1057 (11th Cir.2008), citing *E. Ents. v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) ("Five Supreme Court Justices have expressed the view that the Takings Clause does not apply where there is a mere general liability * * * and where the challenge seeks to invalidate the statute rather than merely seeking compensation for an otherwise proper taking").

{¶ 18} We did not address that question in *Norwood*, but we did address whether heightened scrutiny applied to civil penalties, and the answer was no: "[R]egulations that are directed to economic matters and impose only civil penalties are subject to a 'less strict vagueness test.' " *Id.*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, at ¶ 85, quoting *Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186, 71 L.Ed.2d 362. This language describes R.C. 4928.143(F), so *Norwood* does not require stricter scrutiny here.

## II. R.C. 4928.143(F) is not unconstitutionally vague

{¶ 19} Having established that a more lenient standard of review applies, we now address the merits of CSP's vagueness challenge.

{¶ 20} The void-for-vagueness doctrine is a component of the right to due process and is rooted in concerns that laws provide fair notice and prevent arbitrary enforcement. *Skilling v. United States*, ___ U.S. ___, 130 S.Ct. 2896, 2933, 177 L.Ed.2d 619 (2010). To prevail, a challenging party "must show that the statute is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *State v. Anderson*, 57 Ohio St.3d 168, 171, 566 N.E.2d 1224 (1991), quoting *Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). "Many statutes * * * require administrative and judicial construction to clarify specific language. Such statutes are not unconstitutionally vague." *Minnesota ex rel. Alexander v. Block*, 660 F.2d 1240, 1255 (8th Cir.1981), fn. 35.

### A. We consider CSP's constitutional challenge as applied to the facts of this case

{¶ 21} Litigants may challenge the constitutionality of a statute on its face or as applied. CSP claims that R.C. 4928.143(F) cannot withstand scrutiny, either on its face or as applied. Yet CSP does not make clear which type of challenge it brings. We need not determine, however, whether the challenge is facial or as applied, because the only challenge available to CSP in this case is an as-applied challenge.

{¶ 22} Generally, a court examining a facial-vagueness challenge to a statute that implicates no constitutionally protected conduct will uphold that challenge only if the statute is impermissibly vague in all of its applications. *Columbia Gas Transm. Corp.*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 43, citing *Hoffman Estates*, 455 U.S. at 494-495, 102 S.Ct. 1186, 71 L.Ed.2d 362. CSP has not presented the arguments necessary to support a facial challenge. It does not argue that R.C. 4928.143(F) is "impermissibly vague in all of its applications." Nor does CSP offer any argument that the statute implicates any constitutionally protected conduct. Moreover, where, as in this case, a vagueness challenge does not involve the First Amendment, the analysis must be examined in the light of the facts of the case at hand. *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir.2010) ("Where * * * a vagueness challenge does not involve the First Amendment, the analysis must be as applied to the facts of the case").

{¶ 23} That being the case, we "consider whether [the] statute is vague as applied to the particular facts at issue." *Holder v. Humanitarian Law Project*, ___ U.S. ___, 130 S.Ct. 2705, 2718–2719, 177 L.Ed.2d 355 (2010); *see also Hoffman Estates* at 495 (a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct

of others"); *Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("even if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance * * * where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions and appellants concede as much").

### B. CSP has not shown that R.C. 4928.143(F) is vague as applied to the facts of this case

{¶ 24} CSP has not shown that the "statute is vague as applied to the particular facts at issue." *Holder*, ___ U.S. ___, 130 S.Ct. at 2718–2719, 177 L.Ed.2d 355. The company has not challenged any of the commission's determinations under R.C. 4928.143(F): not the calculation of CSP's return on equity, not the selection of the peer group, and not whether its return significantly exceeded that of the peer group. The commission in fact adopted CSP's proposed return on equity and proposed peer group. And CSP does not even assert, much less demonstrate, that the commission erred in finding that CSP's return on equity significantly exceeded that of comparable companies. CSP's silence on these points is significant. CSP cannot prevail on an as-applied challenge when it does not argue that the statute was erroneously applied to it.

### C. R.C. 4928.143(F) provides substantial guidance to the commission

{¶ 25} And even leaving aside the lack of an as-applied argument, we find that the statute provides considerable guidance to the commission. The company asserts that R.C. 4928.143(F) gives "no notice or guidance as to what is meant by 'significantly excessive earning' and how that determination is to be made." We disagree.

{¶ 26} Whether a plan "resulted in excessive earnings" must be "measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly traded companies, including

utilities, that face comparable business and financial risk, with such adjustments for capital structure as may be appropriate." R.C. 4928.143(F). These are not meaningless words, and they provide a substantial amount of guidance on how to determine significantly excessive earnings. The commission must calculate CSP's "earned return on common equity," determine a comparable group of publicly traded companies (which itself would require numerous other analyses), and then compare their earned returns on equity over the same period of time. *Id.*

{¶ 27} Having done all that, it must then determine whether CSP's earnings are "significantly excessive." *Id.* The term "significantly" also provides guidance. In context, "significant" denotes "weighty" or "notable," which tells the commission to look for more than a mere arithmetical excess before returning funds to customers. *Webster's Third New International Dictionary* 2116 (2002).

{¶ 28} Despite fixing its argument on the term "significantly," CSP cites no case law evaluating its use. But many courts have upheld the term against vagueness challenges. *E.g.*, *VIP of Berlin, L.L.C. v. Berlin*, 593 F.3d 179, 186–191 (2d Cir.2010) (rejecting claim that "significant portion" is unconstitutionally vague); *Williams v. Astrue*, D.Kansas No. 09-1341-SAC, 2010 WL 4291918, at *4 (Oct. 26, 2010) (holding in review of benefits order that "the word 'significant' is not unduly vague"); *PrimeCo Personal Communications, L.P. v. Illinois Commerce Comm.*, Ill.Cir.Ct., Cook Cty. No. 98 CH 05500, 2000 WL 34016430, at *17 (Jan. 11, 2000) (the phrase "no significant impact on the net income" is not vague); *Pennsylvania v. Fahy*, 512 Pa. 298, 315, 516 A.2d 689 (1986) (rejecting claim that the term "significant history" is vague and overbroad); *F. Ronci Co., Inc. v. Narragansett Bay Water Quality Mgt. Dist. Comm.*, R.I. Sup.Ct. No. C.A. NO. 87-0428, 1988 WL 1016804, at *4 (Feb. 9, 1988) ("The Court concludes that the use of the term 'significant quantities' does not render the statutory language unconstitutionally vague"); *but see, e.g.*, *Knoxville v. Entertainment Resources, L.L.C.*, 166 S.W.3d 650, 652, 658 (Tenn.2005) (holding in case involving First

Amendment concerns that "the phrase 'substantial or significant portion of its stock and [sic] trade' is impermissibly vague").

{¶ 29} All of these required determinations limit the scope of the commission's analysis. Further, they provide numerous points that may be litigated below and challenged on appeal to provide a check on arbitrary enforcement by the commission. *See Skilling*, ___ U.S. ___, 130 S.Ct. at 2933, 177 L.Ed.2d 619. In making its argument, CSP repeatedly quotes only two or three words of the statute ("significantly excessive earnings") as though it provided none of the foregoing guidance. But the statute says much more, and we cannot say that " 'no standard of conduct is specified at all.' " *Anderson*, 57 Ohio St.3d at 171, 566 N.E.2d 1224, quoting *Coates*, 402 U.S. at 614, 91 S.Ct. 1686, 29 L.Ed.2d 214.

### D. There are no "fair notice" concerns in this case

{¶ 30} We also hold that this case presents no concerns about fair notice. A primary concern underpinning the vagueness doctrine is that " '[v]ague laws may trap the innocent by not providing fair warning.' " *Hoffman Estates*, 455 U.S. at 498, 102 S.Ct.1186, 71 L.Ed.2d 362, quoting *Grayned v. Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.E.2d 222 (1972). CSP cannot credibly complain that it lacked notice; it not only had notice of R.C. 4928.143(F), but *chose* to be subject to it. Under R.C. 4928.141, CSP was required to provide a standard service offer "in accordance with section 4928.142 or 4928.143 of the Revised Code." Only the latter section requires excessive-earnings review; the former establishes market-based rates. The law has contained the earnings-review provision from the beginning, so CSP was on notice that it faced such review if it opted for an ESP. Presumably, the potential reward outweighed the risk. Thus, CSP's choice to subject itself to earnings review undermines any argument that it lacked fair notice.

### III. CSP's counterarguments

{¶ 31} CSP raises several counterarguments, but we find them unpersuasive. First, it cites no cases reviewing public-utility-regulatory statutes, but depends entirely on cases that involved relatively strict scrutiny and thus are not on point. Most of the cited cases reviewed statutes imposing criminal penalties, and all required a stricter standard of review than applicable here. *See Cline v. Frink Dairy Co.*, 274 U.S. 445, 453–454, 47 S.Ct. 681, 71 L.Ed. 1146 (1927); *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir.1999); *Carter v. Welles-Bowen Realty, Inc.*, 719 F.Supp.2d 846, 852 (N.D.Ohio, 2010); *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 88.

{¶ 32} CSP also argues that the administrative process employed by the commission is evidence of the vagueness of the statute. But this point is unavailing. Courts have often recognized that a "process of interpretation" should be allowed to flesh out statutory standards. *E.g.*, *Bauer v. Shepard*, 620 F.3d 704, 717 (7th Cir.2010) (the Supreme Court is "chary of holding laws unconstitutional 'on their face' precisely because they have recognized that vagueness will be reduced through a process of interpretation"); *Minnesota ex rel. Alexander v. Block*, 660 F.2d at 1254, fn. 35 ("Many statutes * * * require administrative and judicial construction to clarify specific language. Such statutes are not unconstitutionally vague").

{¶ 33} Finally, CSP concludes its argument by asserting that several features of R.C. 4928.143(F) compound the vagueness of the statute. But CSP provides no legal authority or argument suggesting that any of these features are unlawful or otherwise relevant to the void-for-vagueness analysis.

{¶ 34} In sum, we reject CSP's argument that R.C. 4928.143(F) is unconstitutionally vague.

### IEU's and OEG's Arguments

{¶ 35} We turn to the remaining two appeals from OEG and IEU. Both concern the commission's ability to adjust the utility's earnings before considering whether those earnings are significantly excessive. The commission removed certain revenue from off-system sales from CSP's earnings. Although OEG and IEU raise different (and in some ways opposite) arguments, we must reject both of them.

### I. We defer to the commission's reasonable interpretation of R.C. 4928.143(F)

{¶ 36} While we generally review questions of law de novo, we will defer to the commission's interpretation of a statute "where there exists disparate competence between the respective tribunals in dealing with highly specialized issues." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979). One area in which we have "consistently deferred to the expertise of the commission" is in determining rate-of-return matters. *Ohio Edison Co. v. Pub. Util. Comm.*, 63 Ohio St.3d 555, 561, 589 N.E.2d 1292 (1992), fn. 3.

{¶ 37} "Limited judicial review of a rate of return determination is sound" because " 'cost of capital analyses * * * are fraught with judgments and assumptions.' " *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 64 Ohio St.2d 71, 79, 413 N.E.2d 799 (1980), quoting *In re Dayton Power & Light Co.*, Pub. Util. Comm. No. 78-92-EL-AIR, at 26, 29 P.U.R.4th 145 (Mar. 9, 1979). Thus, if a related determination is "fraught with similar judgments and assumptions," it is "appropriate to apply a similar limited standard of review." *Id.*; *see also*, *e.g.*, *Ohio Fuel Gas Co. v. Pub. Util. Comm.*, 174 Ohio St. 585, 602, 191 N.E.2d 347 (1963) ("In the end, the increase in earnings and rate of return allowed is a judgment figure established by the Public Utilities Commission in the exercise of its administrative *expertise*" [emphasis sic]).

{¶ 38} The statute under review is essentially a rate-of-return statute, and it requires numerous judgments regarding rate-of-return issues, so we review the commission's interpretations deferentially. Although R.C. 4928.143(F) does not require the commission to actually set the utility's rate of return, it does require the commission to make numerous related determinations, and the statute as a whole entrusts the commission with regulating "the increase in earnings and rate of return [to be] allowed." *Ohio Fuel Gas Co.*, 174 Ohio St. at 602. Thus, in accordance with the cases cited above, we will defer to the commission's interpretation of R.C. 4928.143(F) if it is reasonable.

{¶ 39} We hold that it was. The commission explains in its brief that it understands R.C. 4928.143(F) as requiring it to "do three things." "First it needs to determine what level of earnings is 'excessive.' " Second, "it must decide how high the excessive earnings must be to be considered 'significantly excessive.' " Finally, it "must eliminate" from earnings any portion that the utility "has shown not to be tied to the ESP that is being reviewed."

{¶ 40} This is a reasonable interpretation of R.C. 4928.143(F). The statute expressly requires the first two determinations. And the third point (eliminating earnings not shown "to be tied to the ESP") finds support in the statutory language. The statute requires the commission to find whether "such adjustments"—referring to "the provisions that are included in an electric security plan"—"*resulted in* excessive earnings." (Emphasis added.) R.C. 4928.143(F). This implies that earnings *not caused by* the plan may be excluded from consideration. This statutory language supports the commission's reading, and no other part of the statute expressly contradicts it.

## II. OEG's alternative interpretation of R.C. 4928.143(F)
## does not compel reversal

{¶ 41} In its appeal, OEG argues that contrary to the commission's interpretation, the commission cannot eliminate any earnings before conducting

the earnings review. As noted above, the commission eliminated from CSP's earnings certain revenue from "off-system sales," that is, wholesale sales by CSP to nonretail customers. Order at 27-30. According to OEG, this lowered CSP's excess earnings by $22.24 million.[1] OEG argues that "R.C. 4928.143(F) requires the [commission] to compare *all* of a utility's earnings to *all* of the earnings of companies with comparable risk." (Emphases sic.) In its view, "the statutory language does not permit the [commission] to selectively exclude certain utility earnings for purposes of the [excessive-earnings] comparison."

**{¶ 42}** But as just discussed, the statutory language does allow such an inference and does not definitively prohibit it. It does not expressly forbid adjustments for non-ESP earnings, nor does it use the phrase "all earnings" or some equivalent. OEG's interpretation is not necessarily unreasonable, but unlike the commission's, OEG's is not entitled to deference.

**{¶ 43}** We must reject OEG's challenge to the order.

### III. IEU's counterarguments also lack merit

**{¶ 44}** IEU raises two basic arguments, but neither compels reversal.

### A. In its first argument, IEU fails to show prejudice

**{¶ 45}** Whereas OEG argues that the commission should not have excluded any earnings from review, IEU argues that the commission should have excluded more. As IEU sees it, the commission may consider the companies' earned return on equity only "from the ESP" and not "for all lines of regulated and unregulated businesses that reside within [the companies]." Therefore, IEU

---

1. In agreeing to eliminate the off-system sales, the commission also noted, but did not resolve, arguments raised by CSP that federal law prohibited the commission from counting the off-system sales. Order at 27, 30. Such sales are regulated by the Federal Energy Regulatory Commission under the Federal Power Act, and CSP argued that federal law prohibited Ohio "from interfering with the Companies' ability to realize revenue rightfully received from wholesale power sales pursuant to contracts or rates approved by FERC." *Id*. at 27. CSP also argued that counting the off-system sales would violate the Commerce Clause of the United States Constitution. *Id*. The commission did not reach these issues, and under our holding, we need not either.

argues, CSP should have prepared "a comprehensive jurisdictional allocation study" showing what earnings resulted from the ESP and what did not.

{¶ 46} IEU has failed to show prejudice, as it must to warrant reversal. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 12 ("this court will not reverse a commission order absent a showing by the appellant that it has been or will be harmed or prejudiced by the order"). In this proposition, IEU neither explains nor provides evidence of which adjustments the commission should have made but did not. This lack of evidence and explanation makes it impossible to know whether IEU was prejudiced by the alleged failure to "jurisdictionalize" CSP's earnings. Consequently, we must reject IEU's first argument.

**B. IEU's second argument—that the commission should have eliminated CSP's transmission assets from review—also fails to demonstrate error**

{¶ 47} IEU's second argument alleges that the commission should have excluded transmission assets when it excluded CSP's revenue from off-system sales. For any revenue excluded from review, it would be necessary to exclude the related portion of equity (i.e., the assets that earned the excluded return). Failing to do so would skew the rate of return too low. The commission did exclude some of CSP's equity to reflect the exclusion of off-system sales, order at 30, but IEU asserts that the commission did not remove enough equity—that it did not "include[] an adjustment to equity to transmission plant."

{¶ 48} Because this argument is also speculative, we must reject it. IEU's argument turns on two questions of fact, both demanding substantial expertise in utility operations, accounting, and finance to answer: Should any of CSP's transmission assets have been excluded to reflect the exclusion of earnings from off-system sales? And if so, how much? Yet IEU does not point to any testimony

or other evidence suggesting that such an exclusion would have been appropriate. Without this factual support, its argument cannot succeed.

{¶ 49} In fact, the testimony that IEU does cite cuts *against* its argument on both points. As to the first point—whether there should even be any exclusion of transmission assets—the witness cited by IEU stated on cross-examination, "[T]here's no way I could even begin to imagine how I would say that [transmission] is a component of off-system sales," and also stated that he suspected that "transmission costs are * * * netted out of the profits from off-system sales." As to the second point—what specific exclusion would be appropriate—the same witness suggested that calculating an adjustment would not be workable: he "could not figure out a way of cleanly * * * utilizing other aspects of the company's assets," such as transmission assets, in excluding the assets from consideration.

{¶ 50} IEU also cites the testimony of an American Electric Power witness who acknowledged that the company had not "exclude[d] the earnings associated with the transmission business." This says nothing about whether such an exclusion should have been made and, if so, the amount. Thus, it provides no support for IEU's argument.

{¶ 51} To overturn the commission on a question of fact, IEU must show that the order is "so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 88 Ohio St.3d 549, 555, 728 N.E.2d 371 (2000). IEU has not shown that the order lacked record support; indeed, the only evidence IEU cites contradicts its own argument. Therefore, we reject it.

### Conclusion

{¶ 52} For the foregoing reasons, we affirm the order. Contrary to CSP's assertion, the statute is not unconstitutionally vague. And neither OEG nor IEU

has shown that the commission unreasonably interpreted or applied R.C. 4928.143(F).

Order affirmed.

O'CONNOR, C.J., and LUNDBERG STRATTON, O'DONNELL, LANZINGER, and MCGEE BROWN, JJ., concur.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

{¶ 53} This case presents this court's first opportunity to address the Public Utilities Commission of Ohio's application of the significantly-excessive-earnings test ("SEET") established by R.C. 4928.143(F). Through the SEET, the commission is to determine how much is too much for electric utilities to charge Ohio consumers pursuant to an electric security plan ("ESP"). It is a determination made after the fact, after consumers have paid their bills, in seeming adherence to the aphorism "It is better to beg forgiveness than ask permission." But the return on investment that the commission allows in this case is not forgivable. It should not be ratified by this court.

{¶ 54} This case tests whether the commission's discretion on SEET matters is truly susceptible of meaningful judicial review. This court cannot allow its deference to the commission's discretion to become an abdication of our duty to provide appellate review of the commission's orders. The commission's outrageous order in this case indicates that the commission believes that its orders have no requirement of reasonableness and that it has carte blanche to interpret statutes as it sees fit. But it is answerable to this court in applying laws passed by the General Assembly and is ultimately statutorily responsible to consumers to provide electric service for reasonable rates.

{¶ 55} Columbus Southern Power ("CSP") requests that this court overturn the commission's order in this case because, it argues, R.C. 4928.143(F)

is unconstitutionally vague. We should overturn the commission's entire order, but not for the reason CSP suggests. Instead, we should hold that the commission abused its discretion in establishing a SEET threshold of 17.6 percent and, further, misapplied R.C. 4928.143(F) by removing off-system sales from its calculation of CSP's income. The commission should start from scratch in this case.

The Reasonableness of 17.6 Percent

{¶ 56} In this case, the commission determined CSP's SEET threshold to be 17.6 percent. That is, only a return on investment of more than 17.6 percent in 2009, a year when the United States' economy was in a recession, would be considered significantly excessive in comparison to other similarly situated entities. Only at that number would CSP's profit be enough to trigger a refund to consumers.

{¶ 57} How did the commission get to 17.6 percent? By employing the highly complex statistical analysis known as "splitting the baby." As the commission points out in its order, AEP-Ohio argued for a SEET threshold of 22.51 percent. The customer parties in the case put forth a proposed SEET threshold in the range of 11.58 percent to 13.58 percent, an average of 12.58 percent. With those numbers to work with, the commission apparently raced to the middle: the halfway point between the proposed SEETs of the customer parties and AEP-Ohio is 17.545 percent. AEP-Ohio got the .055 percent round-up.

{¶ 58} This might be all well and good were the numbers reflective of equally valid methodologies. But the commission's judgments before and after the case at issue support the number put forth by the customer parties.

{¶ 59} After the passage of Am.Sub.S.B. No. 221, the commission sought input from stakeholders to determine the methodology for determining what constitutes significantly excessive earnings. After a long process from October 2009 through April 2010 that included a workshop, a comment period, a period to

reply to comments, and a question-and-answer period before the commission, the commission produced *In re Investigation into the Development of the Significantly Excessive Earnings Test Pursuant to Amended Substitute Senate Bill for Electric Utilities,* Pub. Util. Comm. No. 09-786-EL-UNC, a finding and order intended to provide guidance on the interpretation and application of R.C. 4928.142(D)(4), 4928.143(E), and 4928.143(F). After reviewing the input from interested parties, the commission came to the following conclusion regarding how to determine whether a utility's earnings are significantly excessive:

> Having fully considered all the comments regarding establishing the threshold and in consideration of the discretion afforded the Commission in SB 221, the Commission concludes that "significantly excessive earnings" should be determined based on the reasonable judgment of the Commission on a case-by-case basis.

09-786-EL-UNC Finding and Order, 28-29. So much for predictability.

{¶ 60} Despite leaving the matter up to itself and its own judgment, the commission did set one important marker:

> [T]he Commission is willing to recognize a "safe harbor" of 200 basis points above the mean in the comparable group. To that end, any electric utility earning less than 200 basis points above the mean of the comparable group will be found to not have significantly excessive earnings.

*Id*. at 28-29.

**{¶ 61}** It was that 200 basis points "safe harbor" that the customer parties based their excessive-earnings conclusion upon. Taking their calculation of a relevant return on investment of 9.58 percent for a comparable group of companies, they argued that significantly excessive earnings should run from the safe-harbor amount of 200 basis points up to 400 basis points. This would mean that significantly excessive earnings would fall somewhere between 11.58 and 13.58 percent. Instead, the commission established a figure 800 basis points above the figure that the customer parties determined as the mean of the comparable group of companies.

**{¶ 62}** Even accepting the commission's return-on-investment figure of 11 percent for comparable companies, the commission's 17.6 percent figure is over 600 basis points above the mean in the comparable group. The commission blew its safe harbor out of the water.

**{¶ 63}** And in a case announced in August of this year, *In re Columbus S. Power Co.*, Pub. Util. Comm. Nos. 11-346-EL-SSO, 11-348-EL-SSO, 11-349-EL-AAM, and 11-350-EL-AAM, 2012 WL 3542177, *30 (Aug. 8, 2012), the commission prospectively set a SEET threshold at 12 percent for AEP-Ohio, finding it "appropriate to establish a significantly excessive earnings test (SEET) threshold to ensure that the Company does not reap disproportionate benefits from the ESP. The evidence in the record demonstrates that a 12 percent [return on equity] would be at the high end of a reasonable range for return on equity * * *. Accordingly, for purposes of this ESP, the Commission will establish a SEET threshold for AEP-Ohio of 12 percent."

**{¶ 64}** That lower rate of return is appropriate for an industry with minimal risk, with built-in methods to recover costs from their customers. In *In re Columbus S. Power Co.* (Aug. 8, 2012), for instance, built-in protections for the utility include an alternative-energy rider, a generation-resource rider, a retail-stability rider, a distribution-investment rider, a pool-modification rider, a phase-

in recovery rider, a transmission-cost-recovery rider, an enhanced-service reliability rider, an energy-efficiency and peak-demand reduction rider, an economic-development rider, and a storm-damage-recovery mechanism.

{¶ 65} Most importantly, the lower SEET is consistent with the policy of this state to "[e]nsure the availability to consumers of adequate, reliable, safe, efficient, nondiscriminatory, and reasonably priced retail electric service." R.C. 4928.02(A).

Off-System Sales

{¶ 66} The commission also erred in excluding CSP's off-system sales from the calculation of its return on investment, without any statutory authority. This court has "complete and independent power of review as to all questions of law" in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997). We should not forget that. This court has held that in matters of statutory interpretation, "we may rely on the expertise of a state agency in interpreting a law where 'highly specialized issues' are involved and 'where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly.' " *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, ¶ 12, quoting *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

{¶ 67} This is not a case in which this court needs to rely on the commission's interpretation of a statute. Indeed, we should not simply assume that any statute involving public utilities concerns "highly specialized issues." Here, the General Assembly spells out in plain English what it means by "excessive earnings." Excessive earnings are "measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by

publicly traded companies, including utilities, that face comparable business and financial risk, with such adjustments for capital structure as may be appropriate."

{¶ 68} I would hold that CSP's off-system sales should have been included in the determination of whether CSP's earnings were significantly excessive. They were, after all, earnings. The statute does not allow for removing any amount of income—either from the utility at issue or from the comparable publicly traded companies—from the assessment. The statute seeks an "apples to apples" comparison; taking a few slices out of the Ohio utility's apples skews the evaluation.

{¶ 69} Our deference to—or, too often, our reliance on—the commission's interpretation of statutes diminishes this court's role in reviewing the commission's determinations and shifts the balance too far in favor of the executive branch in the separation of powers. Ultimately, Ohio consumers pay the price for that deference. Judging from Ohio utilities' status at the top of the heap in profits nationwide—CSP had the highest equity return of 143 investor-owned regulated electric utilities in the United States in 2009—that price is steep.

———————————

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Frank P. Darr, and Joseph E. Oliker, for appellant and cross-appellee Industrial Energy Users-Ohio.

Boehm, Kurtz & Lowry, David F. Boehm, and Michael L. Kurtz, for appellant and cross-appellee Ohio Energy Group.

Bruce J. Weston, Ohio Consumers' Counsel, Maureen R. Grady, Melissa R. Yost, and Kyle L. Verrett, for appellant and cross-appellee Ohio Consumers' Counsel.

Steven T. Nourse and Matthew J. Satterwhite; and Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, and Daniel R. Conway, for appellee and cross-appellant Columbus Southern Power Company.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Thomas W. McNamee, Assistant Attorney General, for appellee Public Utilities Commission of Ohio.

Arthur E. Korkosz and Carrie M. Dunn, for amici curiae Ohio Edison Company, Cleveland Electric Illuminating Company, and Toledo Edison Company.

Colleen L. Mooney, for amicus curiae Ohio Partners for Affordable Energy.

_____