[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Edison Co.,* Slip Opinion No. 2016-Ohio-3021.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-3021

IN RE APPLICATION OF OHIO EDISON COMPANY, CLEVELAND ELECTRIC ILLUMINATING COMPANY, AND TOLEDO EDISON COMPANY FOR AUTHORITY TO PROVIDE A STANDARD SERVICE OFFER PURSUANT TO R.C. 4928.143 IN THE FORM OF AN ELECTRIC SECURITY PLAN; NORTHEAST OHIO PUBLIC ENERGY COUNCIL ET AL., APPELLANTS; PUBLIC UTILITIES COMMISSION ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Edison Co.,* Slip Opinion No. 2016-Ohio-3021.]

*Public utilities—Electric-security plan—Public Utilities Commission may consider pricing and other terms and conditions in evaluating whether an electric-security plan is more favorable in the aggregate than the expected results of a market-rate offer—Party seeking reversal of an order of the commission must show that it has been or will be harmed by the order—Order affirmed.*

(No. 2013-0513—Submitted January 6, 2016—Decided May 18, 2016.)

APPEAL from the Public Utilities Commission, No. 12-1230-EL-SSO.

_____

**O'CONNOR, C.J.**

{¶ 1} Appellants, Northeast Ohio Public Energy Council ("NOPEC") and the Environmental Law and Policy Center ("ELPC"), appeal the decision of the Public Utilities Commission of Ohio approving an electric-security plan proposed by intervening appellees, the FirstEnergy Companies (Ohio Edison Company, Cleveland Electric Illuminating Company, and Toledo Edison Company (collectively, "FirstEnergy")). For the reasons explained below, we affirm the commission's order.

## Background

{¶ 2} An electric-distribution utility is required to provide a "standard service offer" to all consumers in its certified territory. R.C. 4928.141(A). The utility may, at its discretion, base the standard service offer on either a market-rate offer ("MRO") or an electric-security plan ("ESP"). *Id.*

{¶ 3} An MRO must be determined through a competitive-bidding process, open to all generation suppliers. R.C. 4928.142(A)(1). A utility has considerably more flexibility to fashion a rate plan as an ESP. *In re Application of Columbus S. Power Co.*, 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276, ¶ 4 (Ohio law "does not provide a detailed mechanism for establishing rates under an ESP"). The only substantive requirement is that the plan must be "more favorable in the aggregate as compared to the expected results" of an MRO. R.C. 4928.143(C)(1).

*FirstEnergy's first two applications*

{¶ 4} On October 20, 2009, FirstEnergy filed an application for a standard service offer based on an MRO ("the MRO case"). After reviewing the MRO application, the commission staff recommended that FirstEnergy instead pursue an ESP.

{¶ **5**} On March 23, 2010, in response to the staff's suggestion, FirstEnergy submitted an application for an ESP ("ESP 2"). The proposed plan would govern the purchase and supply of power for the period between June 1, 2011, and May 31, 2014.

{¶ **6**} In its application, FirstEnergy proposed to establish a competitive bid process for electric power. The key feature of the bid process was that suppliers would not have to purchase all the power needed for the life of the plan in a single auction. Instead, at the outset, bidders could purchase energy to be supplied over variable time increments. And the plan called for a total of four auctions, two in 2010, a third in July 2011, and a final auction in July 2012. By offering multiple auctions and multiple options for the length of the contracts, the companies claimed they could mitigate market fluctuations and stabilize prices over the life of the plan.

{¶ **7**} The application proposed a number of riders by which the suppliers could recover various costs from consumers. One was the Delivery Capital Recovery Rider, which would permit recovery of certain costs, including the investment costs for improving delivery systems. The plan also proposed a rider allowing suppliers to meet their renewable-energy-resource requirements and recover the associated costs incurred that year.

{¶ **8**} In addition, FirstEnergy agreed not to seek recovery of a number of charges. Of particular significance, the companies agreed to forego recovery of regional-transmission-expansion-planning costs, at an estimated cost of $360 million.

{¶ **9**} On April 25, 2010, the commission approved FirstEnergy's ESP 2 application, and FirstEnergy began implementing the terms of the ESP 2.

*FirstEnergy's third application*

{¶ **10**} On April 13, 2012, with two years left on the ESP 2 plan, FirstEnergy filed an application to extend the plan through May 31, 2016 ("ESP 3"). The ESP 3 application consisted of supporting materials including a five-page summary, a

partial stipulation signed by some but not all parties in the case agreeing on certain matters related to the application, and the prefiled testimony of William R. Ridmann, a company witness.

{¶ 11} Ridmann's testimony summarized the provisions of the proposed ESP 3 and identified the changes it would make to the existing plan. However, Ridmann's testimony did not explain or support numerous aspects of the proposed ESP 3. Responding to some parties' concerns, and in anticipation of a hearing, FirstEnergy made supplemental submissions of evidence, including prefiling the testimony of commission staff witness Robert B. Fortney.

{¶ 12} The matter eventually went to hearing on June 4, 2012. The original ESP 3 application had "request[ed] that the Commission take administrative notice of the evidentiary record established in" the ESP 2. On the first day of the hearing, FirstEnergy verbally renewed its request for administrative notice of the record from the ESP 2. The attorney examiner declined to admit the entire record wholesale but invited FirstEnergy to make a document-by-document request.

{¶ 13} Two days later, on June 6, 2012, FirstEnergy submitted a more specific request. FirstEnergy requested that the commission take administrative notice of ten exhibits from the ESP 2 case, including the stipulation filed in that case and transcripts of testimony by several witnesses. FirstEnergy also asked the attorney examiner to take administrative notice of seven exhibits and two transcript pages from the MRO case. The examiner granted the requests over objections.

*Approval of the ESP 3*

{¶ 14} On July 18, 2012, the commission issued an opinion and order approving FirstEnergy's ESP 3 application. The commission expressly found that the ESP 3 was "more favorable in the aggregate" than an MRO.

{¶ 15} On August 17, 2012, ELPC filed a petition for rehearing. NOPEC filed a separate application for rehearing on the same date. ELPC argued that FirstEnergy's ESP 3 application was incomplete when submitted and that the

4

commission erred by permitting the examiner to take administrative notice of materials from the MRO and ESP 2 cases. NOPEC's rehearing application listed 11 alleged errors and included a challenge to the commission's determination that the ESP 3 was more favorable in the aggregate than an MRO.

{¶ 16} On September 12, 2012, the commission granted the applications "for further consideration of the matters specified." Ultimately, however, the commission issued a second entry on rehearing in which it denied the rehearing applications and affirmed its approval of FirstEnergy's ESP 3. The commission found that FirstEnergy's application met the minimum filing requirements of the Ohio Administrative Code. And with respect to the question of administrative notice, the commission concluded that it had fully addressed this issue in its earlier opinion and order and that the rehearing applications had raised no new issues.

{¶ 17} ELPC and NOPEC filed notices of appeal to this court.

**Analysis**

*Standard of review*

{¶ 18} An order of the commission shall be reversed, vacated, or modified only when, upon consideration of the record, this court finds the order to be unlawful or unreasonable. R.C. 4903.13. Under this standard, we will not reverse or modify a decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29.

{¶ 19} The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *AK Steel Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 81, 86, 765 N.E.2d 862 (2002). Although this court has complete and independent

power to review all questions of law, it may rely on the state agency's expertise in interpreting the law when highly specialized issues are involved and agency expertise would be helpful in discerning the intent of the General Assembly. *In re Application to Modify, in Accordance with R.C. 4929.08, the Exemption Granted to E. Ohio Gas Co.*, 144 Ohio St.3d 265, 2015-Ohio-3627, 42 N.E.3d 707, ¶ 11.

*Appeal of the Northeast Ohio Public Energy Council*

{¶ 20} In its appeal, NOPEC presents six propositions of law. The first three propositions of law concern whether and how the commission may consider nonquantitative (qualitative) benefits in conducting the ESP/MRO comparison.

{¶ 21} In its first proposition, NOPEC argues that R.C. 4928.143(C)(1), which sets forth the requirements for an ESP, permits the commission to examine only the quantitative benefits in a proposed ESP and does not permit consideration of nonquantitative (qualitative) benefits to determine whether an ESP is "more favorable" than a market-rate offer. In its second proposition, NOPEC argues that the commission erred by considering qualitative benefits in its ESP/MRO comparison. And in its third proposition, NOPEC suggests that even if it were statutorily permissible to consider *some* qualitative benefits, the commission may not consider the specific benefits cited in its decision.

{¶ 22} In *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 402, 2011-Ohio-958, 945 N.E.2d 501, we held that R.C. 4928.143(C)(1) "does not bind the commission to a strict price comparison. On the contrary, * * * the statute instructs the commission to consider 'pricing *and all other terms and conditions*' " in evaluating whether the ESP is more favorable in the aggregate than an expected MRO. (Emphasis sic.) *Id*. at ¶ 27, quoting R.C. 4928.143(C)(1). The rule announced in *Columbus S. Power Co.* is dispositive of NOPEC's first three propositions of law.

{¶ 23} NOPEC's fourth proposition asserts that when the ESP is viewed purely in terms of quantitative benefits, the commission erred because the MRO

6

was more favorable than the ESP. According to NOPEC, the inclusion of the Delivery Capital Recovery Rider, which authorizes suppliers to recover certain investment costs, makes the ESP more costly for consumers than an MRO, which has no comparable investment-cost-recovery mechanism.

{¶ 24} In reaching its decision, the commission assumed that if an MRO were put in place, then suppliers would still be able to recover investment costs, in that case by way of a distribution-rate case. Over a sufficient time period, the commission concluded, the cost to consumers under the rider or a distribution-rate case would be a wash.

{¶ 25} On appeal, NOPEC argues that the MRO statute, R.C. 4928.142, does not permit the inclusion of hypothetical distribution-rate-case revenues as part of the MRO/ESP comparison. But NOPEC's argument fails to recognize that unlike an MRO, an ESP will include all sorts of cost-recovery mechanisms at the outset, *see* R.C. 4928.143(B)(2)(a). Therefore, under NOPEC's statutory interpretation, the MRO will *always* appear to be quantitatively more favorable but will never reflect the true cost of the MRO over time.

{¶ 26} Alternatively, NOPEC objects to the commission's decision to calculate the value of the Delivery Capital Recovery Rider for the first two years only, without considering the possibility that the rider, and its corresponding costs to customers, could be renewed perpetually. We conclude that the decision whether to project the value of the rider further into the future is precisely the sort of calculation that falls within the expertise of the commission, and we will not reverse the commission's decision absent an abuse of discretion, which NOPEC has not demonstrated.

{¶ 27} We therefore reject NOPEC's fourth proposition of law.

{¶ 28} In its fifth proposition, NOPEC challenges the decision of the commission to take administrative notice of the evidence generated in the MRO and ESP 2 cases. Specifically, NOPEC claims that it was an abuse of discretion for

the commission to use this noticed information as substantive evidence to support the commission's ultimate decision.

{¶ 29} There is neither an absolute right for nor an absolute prohibition against the commission taking administrative notice of facts outside the record of a case. *Canton Storage & Transfer Co. v. Pub. Util. Comm.*, 72 Ohio St.3d 1, 8, 647 N.E.2d 136 (1995). Rather, each case must be resolved on its facts, and "the factors [this court] deem[s] significant include whether the complaining party had prior knowledge of, and had an adequate opportunity to explain and rebut, the facts administratively noticed." *Allen v. Pub. Util. Comm*., 40 Ohio St.3d 184, 186, 532 N.E.2d 1307 (1988). In all cases, the complaining party must demonstrate prejudice. *Id.*

{¶ 30} NOPEC contends that because the administrative-notice motion was granted so late in the proceedings, it did not have prior knowledge of the facts to be noticed or an adequate opportunity to rebut them. We will concede, for argument's sake, that FirstEnergy's (rejected) request for administrative notice of the entire ESP 2 record was not sufficient notice of the specific facts and evidence that it would ultimately use. And we will also grant that prehearing discovery was an inadequate remedy, not only because NOPEC did not know the issues or witnesses on which to take discovery, but also because Ohio Adm.Code 4901-1-16, governing prehearing discovery, does not permit taking discovery from the commission staff. Ohio Adm.Code 4901-1-16(I). Even so, NOPEC's fifth proposition of law must fail because it has not demonstrated prejudice.

{¶ 31} NOPEC's prejudice argument is based on the following facts: in its ESP 3 approval order, the commission identified a number of "significant additional benefits for customers" in the plan, including a 6 percent discount for certain low-income customers, a provision for shareholder funding of economic development for low-income customers, and terms spreading renewable-energy-cost recovery over a longer period in order to reduce customer prices. NOPEC

alleges that those benefits were not mentioned in commission staff member Fortney's prefiled testimony, nor did Fortney raise these issues when he testified in person at the ESP 3 hearing.

{¶ 32} The next day, after Fortney's testimony and cross-examination were complete, FirstEnergy made its motion for the commission to take administrative notice of specific exhibits from the ESP 2 and MRO cases. Among the exhibits accepted into the record was the prefiled ESP 2 testimony of commission staff witness Tamara S. Turkenton. Turkenton identified 11 beneficial features of the plan, including the benefits mentioned above. But because Turkenton did not testify in person at the ESP 3 hearing, she could not be cross-examined. NOPEC therefore concludes that the commission relied on testimony to which NOPEC had no opportunity to respond.

{¶ 33} The flaw in this argument is that the claims in Turkenton's prefiled testimony were also made by William R. Ridmann in his prefiled testimony, which was attached to the ESP 3 application. And unlike Turkenton, Ridmann *did* testify at the hearing and was subject to cross-examination. Thus, NOPEC had advance notice of these alleged benefits and an opportunity to challenge them with evidence of its own. Therefore, NOPEC cannot demonstrate that it was prejudiced by the decision to take administrative notice.

{¶ 34} NOPEC cites *Canton Storage & Transfer Co.*, 72 Ohio St.3d 1, 647 N.E.2d 136 (1995), for the proposition that the commission cannot reduce an applicant's burden of proof by taking administrative notice of nonwitness testimony. But that case is easily distinguishable.

{¶ 35} *Canton Storage* involved applications from 22 companies for certificates of public convenience and necessity to carry household goods. A transportation company seeking such a certificate must submit testimony from at least two shipper witnesses regarding the public need for the service. *Id.* at 6. But in *Canton Storage*, only four of the applicants met this requirement. *Id.* The

commission took administrative notice of the testimony offered in support of the four sufficient applications and used it to bolster the other 18 applications, which were incomplete. By doing so, we held, the commission improperly reduced the burden of proof for the 18 applicants who benefited from testimony that they did not produce. *Id.* at 9.

{¶ 36} In this case, the commission did not reduce FirstEnergy's burden of proof by taking administrative notice of the ESP 2 and MRO materials—it relied on the testimony of Ridmann in the ESP 3 case. NOPEC has failed to identify any facts or opinions of which the commission took notice that were not already in the ESP 3 record from some other source. Nor has NOPEC shown that absent the administratively noticed evidence, the application would have been inadequate. Therefore, we conclude that NOPEC's fifth proposition lacks merit.

{¶ 37} Finally, in its sixth proposition of law, NOPEC challenges the PUCO's approval of the partial stipulation submitted with the ESP 3 application. When considering whether to approve a partial stipulation, the commission employs the following three-part test, which we have previously endorsed:

> (1)    Is the settlement a product of "serious bargaining" among capable, knowledgeable parties?
>
> (2)    Does the settlement, as a package, benefit ratepayers and the public interest?
>
> (3)    Does the settlement package violate any important regulatory principle or practice?

*Office of Consumers' Counsel v. Pub. Util. Comm.*, 64 Ohio St.3d 123, 126, 592 N.E.2d 1370 (1992). NOPEC disputes whether the stipulation was the product of serious bargaining, because the parties did not represent sufficiently diverse interests.

**{¶ 38}** In support of its allegation that the stipulation was not subject to serious bargaining, NOPEC points to one instance in which, it alleges, the parties to the stipulation collaborated as proof that they were not truly opposed. To wit, in the ESP 2 application, the companies agreed not to seek recovery, through retail rates, of regional-transmission-expansion-planning costs either until May 31, 2016, or until the total costs exceeded $360 million, whichever occurred first. The stipulation attached to the ESP 3 application proposed to retain this provision.

**{¶ 39}** Ridmann discussed the retention of this feature in his prefiled testimony submitted with the application. He called the regional-transmission-expansion-planning forbearance provision "[a] significant *continuing* benefit of ESP 3, *as in the existing ESP*." (Emphasis added.) And in his attached spreadsheet comparing the present-value benefits of the ESP 3 to an MRO, he attributed $293.7 million in benefits to the regional-transmission-expansion-planning provision. However, in subsequent testimony, staff witness Fortney expressed the staff's opinion that "the benefit of this credit was a result of [ESP 2] and is not a direct benefit of ESP 3, thus should not be reflected in the ESP 3 vs. MRO analysis." In other words, the parties to the stipulation and the commission staff double-counted the nearly $300 million benefit of the regional-transmission-expansion-planning forbearance—once as a benefit of ESP 2 and again as a benefit of ESP 3—even though the actual funds would only be realized once.

**{¶ 40}** The only conceivable explanation for this error, according to NOPEC, is that "in their haste to meet the Company's self-imposed deadline, the signatory parties did not seriously bargain." NOPEC concedes that the parties to the stipulation (and their counsel) are capable and knowledgeable. It cites that very competence and experience to bolster its argument that the parties to the stipulation did not engage in "serious bargaining."

**{¶ 41}** This argument fails for two reasons. First, the difference between the Ridmann and Fortney calculations does not necessarily represent correction of

an error. Rather, the two witnesses were answering different questions. Ridmann was comparing the quantitative benefits of the ESP 3, in totality, as compared to an MRO, as the statute requires. Fortney, on the other hand, was using the existing ESP 2 as a baseline and comparing only the quantitative benefits of the ESP 3 extension. In short, this appears to be a methodological disagreement, not a mistake. And second, even if the stipulation had double-counted the regional-transmission-expansion-planning credit, a single error in a complex filing such as this is not necessarily evidence that the parties failed to bargain seriously. Mistakes occur in even the most serious negotiations involving the most competent and experienced negotiators.

{¶ 42} Alternatively, NOPEC questions whether the stipulation represented the interests of the broad residential class. We have expressed grave concern regarding a stipulation when an entire customer class is intentionally excluded from the settlement talks. *Time Warner AxS v. Pub. Util. Comm.*, 75 Ohio St.3d 229, 233, 661 N.E.2d 1097 (1996), fn. 2. However, the deliberate exclusion of specific customer-class members does not raise the same concern, so long as the class in its entirety is not excluded. *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 16-24.

{¶ 43} The ESP 3 stipulation came about in the following fashion: FirstEnergy contacted every party to the ESP 2 and gave each an opportunity to review and comment on the draft stipulation for the ESP 3. The commission found no evidence that FirstEnergy excluded an entire customer class from the negotiations.

{¶ 44} NOPEC's contention is that FirstEnergy strategically selected the parties with whom it would negotiate—i.e., that it spoke only to parties who claimed to represent the general interests of residential customers but actually represented the more narrow interests of low-income customers. Those parties, NOPEC alleges, reached a stipulation with FirstEnergy based on the interests of

their low-income constituents and did not negotiate to protect the interest of the broader residential-customer class.

{¶ 45} NOPEC's assignment of error would require this court to review the negotiations in their entirety and to ascertain whether any residential-class party made a demand that would have benefited the larger class and, if so, when and why the demand was dropped. NOPEC cites no authority for the proposition that this court must undertake such a review nor any compelling reason why it would be revelatory. This is not a case in which the applicant bargained with a single entity who might be an adequate class representative or have its own, more parochial interests that are not reflective of the class as a whole.

{¶ 46} Finally, NOPEC registers a general objection to the process employed, specifically the absence of a conventional meeting, with all the parties assembled around a physical table. NOPEC identifies no legal support for the suggestion that "serious bargaining" can only occur in such a setting.

{¶ 47} For all these reasons, we hold that NOPEC's sixth proposition of law has no merit.

*Appeal of the Environmental Law and Policy Center*

{¶ 48} In its sole proposition of law, ELPC contends that the commission's approval of the ESP 3 was unlawful and unreasonable because FirstEnergy's application was incomplete, in violation of Ohio Adm.Code 4901:1-35-03(C)(1). A standard-service-offer application based on an ESP must include "[a] complete description of the ESP and testimony explaining and supporting each aspect of the ESP." *Id.* ELPC argued at the commission level, and continues to assert here, that the ESP 3 application was incomplete and therefore invalid, because the supporting testimony from Ridmann left a host of topics unaddressed.

{¶ 49} We will not reverse an order of the commission unless the party seeking reversal shows that it has been or will be harmed by the order. *Buckeye Energy Brokers, Inc. v. Palmer Energy Co.,* 139 Ohio St.3d 284, 2014-Ohio-1532,

11 N.E.3d 1126, ¶ 19. ELPC has not shown that it was prejudiced by the allegedly incomplete application in any way. And for that reason, we will not reverse the decision of the commission.

### Conclusion

{¶ 50} For the reasons discussed, we affirm the order of the commission.

Order affirmed.

PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

————————

Bricker & Eckler, L.L.P., Glenn S. Krassen, Dane Stinson, Matthew W. Warnock, and J. Thomas Siwo, for appellant Northeast Ohio Public Energy Council.

Madeline Fleisher, Justin Vickers, and Nicholas McDaniel, for appellant Environmental Law & Policy Center.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Thomas McNamee, Assistant Attorney General, for appellee.

Jones Day and David A. Kutik; and James W. Burk, and Carrie M. Dunn, for intervening appellees.

————————