[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Dayton Power & Light Co.*, Slip Opinion No. 2025-Ohio-2953.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-2953

IN RE APPLICATIONS OF DAYTON POWER AND LIGHT COMPANY FOR ADMINISTRATION OF THE SIGNIFICANTLY EXCESSIVE EARNINGS TEST UNDER R.C. 4928.143(F) AND ADM.CODE 4901:1-35-10;

OFFICE OF THE OHIO CONSUMERS' COUNSEL, APPELLANT AND CROSS-APPELLEE; PUBLIC UTILITIES COMMISSION, APPELLEE AND CROSS-APPELLEE; DAYTON POWER AND LIGHT COMPANY, APPELLEE AND CROSS-APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Dayton Power & Light Co.*, Slip Opinion No. 2025-Ohio-2953.]

*Public utilities—Significantly-excessive-earnings test—R.C. 4928.143(F)—Public Utilities Commission not authorized to allow utility to retain significantly excessive earnings from electric security plan based on utility's commitment to make future investments—Orders reversed and cause remanded to commission to conduct new significantly-excessive-earnings-test analysis.*

(No. 2021-1473—Submitted April 2, 2025—Decided August 22, 2025.)

APPEAL and CROSS-APPEAL from the Public Utilities Commission, Nos. 18-1875-EL-GRD, 18-1876-EL-WVR, 18-1877-EL-AAM, 19-1121-EL-UNC, 20-680-EL-UNC, 20-1041-EL-UNC.

_____

KENNEDY, C.J., authored the opinion of the court, which FISCHER, DEWINE, BRUNNER, ZAYAS, HAWKINS, and SHANAHAN, JJ., joined. MARILYN ZAYAS, J., of the First District Court of Appeals, sat for DETERS, J.

**KENNEDY, C.J.**

{¶ 1} This appeal concerns three separate cases that were consolidated before appellee and cross-appellee, the Public Utilities Commission of Ohio, for the purpose of considering a proposed stipulation intended to resolve each case.

{¶ 2} Two cases involve applications of appellee and cross-appellant Dayton Power and Light Company, d.b.a. AES Ohio ("DP&L"), to retrospectively determine whether its electric security plan ("ESP") resulted in significantly excessive earnings for 2018 and 2019. *See* R.C. 4928.143(F). (An ESP is one way that an electric utility can establish a standard-service offer, which is the generation rate charged to customers who do not purchase electric-generation service from a competitive retail electric-service provider. *See generally In re Application of Ohio Power Co.,* 2024-Ohio-2890, ¶ 6.) The commission found that DP&L's ESP resulted in excessive earnings in each year. The commission, however, determined that DP&L could offset the excessive earnings, and thereby avoid any refund to consumers, because the company had committed to making future capital investments.

{¶ 3} The third case addressed the fact that DP&L would be operating under its current ESP for more than three years. When that occurs, R.C. 4928.143(E) requires the commission to determine in the fourth year of the ESP, and every fourth year thereafter, (1) whether the prospective effect of the plan is substantially likely

to result in significantly excessive earnings over the forecast period and (2) whether the plan continues to be more favorable in the aggregate than the expected results of a market-rate offer. The commission's order, which refers to these two tests collectively as the "Quadrennial Review," found that DP&L passed both tests.

{¶ 4} Appellant and cross-appellee, the Office of the Ohio Consumers' Counsel ("OCC"), filed this appeal, challenging the commission's decisions (1) refusing to refund significantly excessive earnings for 2018 and 2019 to consumers and (2) refusing to remove the rate-stabilization charge from DP&L's ESP.

{¶ 5} DP&L has filed a protective cross-appeal against the commission, asserting alternative grounds for affirmance should we hold that the commission erred with respect to the excessive-earnings or rate-stabilization-charge issues.

{¶ 6} As discussed in detail below, we reverse the commission's determination allowing DP&L to offset excessive earnings rather than return those earnings to consumers, and we remand this matter to the commission for further consideration. We reject OCC's challenge to the rate-stabilization charge, because the legality of that charge is not at issue in this appeal. And as for DP&L's protective cross-appeal, we reject its arguments that we should affirm the commission's order on alternative grounds.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Related proceedings: withdrawal of ESP III and return to ESP I

{¶ 7} Ohio law allows electric-distribution utilities, like DP&L, to make a standard service offer of generation service through an ESP. *See* R.C. 4928.143. By way of background, the commission approved DP&L's third ESP ("ESP III"), effective November 1, 2017. *See In re Application of Dayton Power & Light Co. to Establish a Std. Serv. Offer in the Form of an Elec. Sec. Plan*, PUCO No. 16-

---

1. Three other cases, PUCO case Nos. 18-1875-EL-GRD, 18-1876-EL-WVR, and 18-1877-EL-AAM, were also consolidated with these three cases before the commission. However, OCC does not directly challenge the commission's order regarding those cases.

395-EL-SSO, Opinion and order, ¶ 1, 141-142 (Oct. 20, 2017). On November 21, 2019, the commission issued a supplemental order eliminating DP&L's distribution-modernization rider from ESP III. *See In re Application of Dayton Power & Light Co. to Establish a Std. Serv. Offer in the Form of an Elec. Sec. Plan*, PUCO No. 16-395-EL-SSO, Supplemental opinion and order, ¶ 107-110 (Nov. 21, 2019); *see also In re Application of Dayton Power & Light Co. to Establish a Std. Serv. Offer in the Form of an Elec. Sec. Plan*, PUCO No. 08-1094-EL-SSO, Second finding and order, ¶ 8 (Dec. 18, 2019) (hereinafter, "*ESP I Order*"). The commission's removal of the rider was a result of this court's decision in *In re Application of Ohio Edison Co.*, 2019-Ohio-2401, ¶ 56 (lead opinion), which invalidated a similar distribution-modernization rider of another utility.

{¶ 8} In 2019, the commission accepted DP&L's request to withdraw and terminate ESP III. *See ESP I Order* at ¶ 9; *In re Application of Dayton Power & Light Co. to Establish a Std. Serv. Offer in the Form of an Elec. Sec. Plan*, PUCO No. 16-395-EL-SSO, Finding and order, ¶ 16-22 (Dec. 18, 2019). In light of the withdrawal and termination of ESP III, the commission granted DP&L's application to reinstate ESP I, which was the ESP that had immediately preceded ESP III. *See ESP I Order* at ¶ 10; *see also* R.C. 4928.143(C)(2)(b). The commission restored the provisions, terms, and conditions of ESP I, including the rate-stabilization charge, with certain modifications not relevant here. *See ESP I Order* at ¶ 27-29, 42. (The commission had previously granted DP&L's motion to withdraw and terminate ESP II, and it allowed DP&L to reinstate ESP I until the approval of ESP III. *See generally In re Dayton Power & Light Co.*, 2018-Ohio-4009, ¶ 5-6. That is why ESP I replaced ESP III following the subsequent withdrawal and termination of ESP III.)

{¶ 9} OCC appealed the commission's decision permitting DP&L to reinstate ESP I. DP&L filed a cross-appeal challenging the commission's decision ordering the company to add tariff language making the rate-stabilization charge

refundable. *See* case No. 2021-1068. In April 2022, this court sua sponte dismissed both the appeal and the cross-appeal as premature for lack of jurisdiction, because the case was still pending before the commission on rehearing. *See* 2022-Ohio-1156.

{¶ 10} In November 2022, the commission issued its final rehearing entry in the proceedings in which it reinstated ESP I. *See In re Application of Dayton Power & Light Co. to Establish a Std. Serv. Offer in the Form of an Elec. Sec. Plan*, PUCO No. 08-1094-EL-SSO, Tenth rehearing entry, ¶ 8 (Nov. 30, 2022). Thereafter, DP&L appealed to this court in case No. 2023-0111, once again challenging the commission's decision ordering the company to include tariff language making the rate-stabilization charge refundable. OCC appealed the same entry but did so in case No. 2023-0130, arguing that the commission erred in allowing DP&L to (1) reinstate ESP I and (2) continue charging the rate-stabilization charge as an approved provision of ESP I. Both DP&L and OCC filed cross-appeals in each other's appeals.

## B. The present case: the commission's review of ESP III and ESP I under R.C. 4928.143(E) and (F)

{¶ 11} While the proceedings involving the return to ESP I were pending before the commission, litigation continued in separate cases before the commission concerning the scope and reasonableness of both ESP III and ESP I. The reinstatement of ESP I triggered R.C. 4928.143(E), a provision that requires the commission to conduct two separate tests for an ESP with a term exceeding three years. DP&L filed an application to test whether, in its fourth cumulative year, ESP I would continue to be more favorable when compared to the expected results of a market-rate offer under R.C. 4928.142. DP&L opened another case with the commission under R.C. 4928.143(E), which required the commission to determine prospectively whether ESP I would be likely to provide the company with significantly excessive earnings during the 2020 through 2023 forecast period.

5

**{¶ 12}** In addition, R.C. 4928.143(F) requires the commission to determine annually whether an ESP resulted in significantly excessive earnings for an electric-distribution utility. To this end, DP&L filed two other cases, PUCO case Nos. 19-1121-EL-UNC and 20-1041-EL-UNC, pursuant to R.C. 4928.143(F) to determine whether it had significantly excessive earnings under ESP III for 2018 and under ESP III and ESP I for 2019.[2]

**{¶ 13}** In October 2020, DP&L, the commission staff, and 18 other parties agreed to a "Stipulation and Recommendation" that, if approved, would resolve case Nos. 19-1121-EL-UNC and 20-1041-EL-UNC, 20-0680-EL-UNC, and a fourth case not relevant here. The stipulating parties recommended that the commission find that DP&L passed the retrospective significantly-excessive-earnings test ("SEET") under R.C. 4928.143(F) for 2018 and 2019 and that the company passed the two prospective Quadrennial Review tests under R.C. 4928.143(E).

**{¶ 14}** On June 16, 2021, the commission issued an opinion and order approving the stipulation without modification. PUCO No. 18-1875-EL-GRD, Opinion and order, ¶ 97-102 (June 16, 2021).[3] Nonetheless, the commission independently conducted the statutory tests required by R.C. 4928.143(E) and (F).

**{¶ 15}** After reviewing DP&L's annual earnings in accordance with R.C. 4928.143(F), the commission found that DP&L had excessive earnings of $3.7 million in 2018 and $57.4 million in 2019—a total of $61.1 million over those two years. PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 62, fn. 10 (June 16, 2021). The commission, however, determined that no refund was due to customers

---

2. The commission approved DP&L's reinstatement of ESP I on December 18, 2019. *ESP I Order* at ¶ 10, 42.

3. The commission's June 16, 2021 opinion and order addressed six separate cases: PUCO case Nos. 18-1875-EL-GRD, 18-1876-EL-WVR, 18-1877-EL-AAM, 19-1121-EL-UNC, 20-680-EL-UNC, and 20-1041-EL-UNC. For ease of reference, we will cite this opinion and order as "PUCO No. 18-1875-EL-GRD, Opinion and order (June 16, 2021)."

because DP&L had committed itself to making substantial investments to improve and modernize its distribution infrastructure over the next four years. *Id*. at ¶ 68. The commission also found that, independent of DP&L's commitments, no customer refunds were appropriate because AES Corporation—DP&L's parent corporation—made a $150 million capital contribution to DP&L in 2020 and committed an additional $150 million in 2021, *id*. at ¶ 69, which DP&L asserts was subsequently made.

{¶ 16} As for the Quadrennial Review case, the commission found that ESP I passed the prospective SEET because DP&L's projected return on equity was expected to fall well below the projected SEET threshold for the forecast period of 2020 through 2023. *Id*. at ¶ 59-60. The commission also found that DP&L's continuing operation under ESP I would be more favorable in the aggregate than the expected results of a market-rate offer. *Id*. at ¶ 58.

{¶ 17} Finally, the commission rejected OCC's challenges to the legality of the rate-stabilization charge, finding that the rate-stabilization charge was an original provision of ESP I and that OCC was "legally barred from collaterally attacking the [rate-stabilization charge] as part of the *Quadrennial Review Case*." (Italics in original.) *Id*. at ¶ 57. The commission also determined that the rate-stabilization charge, a lawful provision of ESP I, was at issue only with respect to whether DP&L passed the Quadrennial Review and the retrospective SEET. *Id*. at ¶ 78.

{¶ 18} The commission rejected OCC's application for rehearing of the commission's decision. *See* PUCO No. 18-1875-EL-GRD, Second rehearing entry, ¶ 37 (Oct. 6, 2021); PUCO No. 18-1875-EL-GRD, Third rehearing entry, ¶ 26-27 (Dec. 1, 2021). The commission also rejected DP&L's application for rehearing, in which DP&L had requested that the commission include additional grounds upholding its decision in favor of the company. PUCO No. 18-1875-EL-GRD, Second rehearing entry, ¶ 44-52 (Oct. 6, 2021).

{¶ 19} OCC appealed to this court and DP&L filed a protective cross-appeal. Both of those parties have submitted merit briefs in support of their positions. Additionally, the commission has submitted briefs in defense of its order.

### C. *Joint motions to consolidate appeals and defer oral argument in case No. 2021-1473*

{¶ 20} In March 2023, DP&L and OCC filed a joint motion to consolidate this case, case No. 2021-1473, with case Nos. 2023-0111 and 2023-0130 and to defer oral argument in this case, which was scheduled to be argued in April 2023. DP&L and OCC represented that they were engaged in settlement discussions that, if successful, would resolve the SEET issues raised herein. DP&L and OCC also maintained that this case shared common questions of law and fact involving the rate-stabilization charge with the other two appeals and that consolidating all three cases would allow for an efficient and uniform briefing and oral-argument schedule and would enable this court to resolve the common issues from all three appeals in a single decision. We granted the motion, deferring oral argument in this case and consolidating all three appeals for oral argument and decision only. 2023-Ohio-1062.

{¶ 21} While settlement negotiations involving this case, case No. 2021-1473, were ongoing, the parties completed briefing in case Nos. 2023-0111 and 2023-0130. In November 2023, OCC informed this court that settlement negotiations involving this case had failed to produce an agreement. Accordingly, OCC requested that the consolidated appeals be scheduled for oral argument. No party opposed OCC's request, and we issued an entry stating that oral argument would be scheduled at a later date. 2023-Ohio-4375. In August 2024, we sua sponte deconsolidated this case from case Nos. 2023-0111 and 2023-0130. *See* 2024-Ohio-3227. We then held oral argument on April 2, 2025.

## II. STANDARD OF REVIEW

**{¶ 22}** "R.C. 4903.13 provides that a [commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 2004-Ohio-6767, ¶ 50. The appellant bears the burden of demonstrating that the commission's decision was unlawful or unreasonable. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154 (1990).

**{¶ 23}** A commission order is unlawful if it rests on an erroneous interpretation of a statute or if the commission fails to follow procedures prescribed by statute or commission rule. *See In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 11-12; R.C. 4906.12. We have "complete and independent power of review as to all questions of law" in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.*, 1997-Ohio-196, ¶ 16.

**{¶ 24}** An order is unreasonable when the commission's exercise of its discretion in making determinations within broad statutory criteria falls outside "the zone of permissible statutory construction." *Id.* at ¶ 15; *see* R.C. 4906.12. Additionally, a commission order is unreasonable "when the decision is manifestly contrary to the evidence in the record" or when the evidence is clearly insufficient to support the decision. *Firelands Wind* at ¶ 16. Likewise, an order is unreasonable when it is "internally inconsistent." *Id*.

**{¶ 25}** In adjudicating whether a commission order is unreasonable, we do not "reweigh the evidence or second-guess the [commission] on questions of fact." *In re Complaints of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 35. We will not disturb the commission's factual determination "'where the record contains sufficient probative evidence to show the [commission's] determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful

disregard of duty.'" *Monongahela Power Co. v. Pub. Util. Comm.*, 2004-Ohio-6896, ¶ 29, quoting *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 2000-Ohio-422, ¶ 27.

### III. ANALYSIS

{¶ 26} OCC raises three propositions of law and DP&L raises two propositions of law. Before discussing the merits, we address the commission's jurisdictional challenge to certain arguments raised by OCC under its first proposition of law.

#### A. *The OCC did not preserve all arguments under its first proposition of law*

{¶ 27} The commission argues that we lack jurisdiction over four arguments asserted under OCC's first proposition of law. According to the commission, OCC failed to specify these alleged errors in an application for rehearing of the commission's order as required by R.C. 4903.10.

{¶ 28} An appellant is barred from raising a claim on appeal that was not specifically set forth in an application for rehearing of the commission's order. *See* R.C. 4903.10(B); *In re Application of Columbus S. Power Co.*, 2014-Ohio-462, ¶ 55; *see also Discount Cellular, Inc. v. Pub. Util. Comm.*, 2007-Ohio-53, ¶ 59 ("we have strictly construed the specificity test set forth in R.C. 4903.10"). After a review of the commission's argument, we conclude that we lack authority to review one of the challenged arguments.

#### 1. OCC preserved its two statutory-construction arguments

{¶ 29} The commission contends that we lack jurisdiction over the following arguments asserted under OCC's proposition of law No. 1(B):

(1) OCC's argument that the plain language of R.C. 4928.143(F), specifically the sentence requiring the commission to "also" consider "the capital requirements of future committed investments," does not allow the commission to deny the return of significantly excessive earnings to consumers; and

10

(2) OCC's argument that consideration must be given to the placement of the "future committed investments" sentence, consistent with the rules of statutory construction.

{¶ 30} OCC counters that these arguments were specifically set forth in its application for rehearing that was filed with the commission on July 16, 2021, and in its third rehearing application that was filed on November 5, 2021. We agree with OCC.

{¶ 31} OCC argued on rehearing that the "future committed investments" sentence of R.C. 4928.143(F) did not allow the commission to deny consumer refunds once it was determined that DP&L had significantly excessive earnings. Mirroring its argument on appeal, OCC specifically argued on rehearing that the "words and placement of the 'future committed investment[s]'" language in R.C. 4928.143(F) did not authorize the commission to deny consumer refunds simply because DP&L has committed to make future capital investments.

{¶ 32} OCC repeated this argument in its third rehearing application, specifically alleging that the "words and placement of the 'future committed investments' language" in R.C. 4928.143(F) did not authorize the commission's decision to deny a refund to consumers in this case. In short, OCC met R.C. 4903.10's specificity requirement, and we have authority to review OCC's statute-based arguments.

### 2. OCC did not need to preserve the alleged misuse of commission staff witness Buckley's testimony

{¶ 33} The commission maintains that OCC failed to preserve the claim that the commission improperly recast staff witness Joseph Buckley's testimony to enhance the record for approving the settlement. OCC concedes that it did not raise the alleged mischaracterization of Buckley's testimony at any point in the proceedings before the commission, including on rehearing. OCC, however, claims

that it only "provided [this] assessment as background material for the Court to consider."

{¶ 34} R.C. 4903.10(B) states that "[n]o party shall in any court urge or rely on any ground for reversal, vacation, or modification [of a commission order] not so set forth in the application [for rehearing]." Because OCC avers that it is relying on its assessment of Buckley's testimony only as background material—rather than grounds for reversal, vacation, or modification—OCC was not required to raise the issue in a rehearing application before the commission.

### 3. We lack authority to review OCC's argument regarding the SEET Workshop case

{¶ 35} The commission's final argument is that OCC failed to argue on rehearing that the commission disregarded *In re Investigation into the Dev. of the Significantly Excessive Earnings Test pursuant to Amended Substitute Senate Bill 221 for Elec. Util.*, PUCO No. 09-786-EL-UNC, 2010 Ohio PUC LEXIS 707 (June 30, 2010) (hereinafter, the "SEET Workshop case"), when it ruled that DP&L's future capital investments allowed for the offset of significantly excessive earnings.

{¶ 36} OCC does not dispute that it failed to mention the SEET Workshop case on rehearing before the commission. OCC, however, asserts that it properly raised this issue when it argued on rehearing that the commission failed to follow other precedent that extensively relied on the SEET Workshop case, namely the commission's SEET review of Columbus Southern Power Company's electric security plan decided in 2011. *See In re Application of Columbus S. Power Co. & Ohio Power Co. for Administration of the Significantly Excessive Earnings Test*, PUCO No. 10-1261-EL-UNC, 2011 WL 194464 (Jan. 11, 2011). In support, OCC cites *Lycourt-Donovan*, 2017-Ohio-7566, at ¶ 45-46, for the proposition that we disfavor the type of "[h]ypertechnical jurisdictional objections" that OCC alleges the commission advances here.

12

{¶ 37} OCC's reliance on *Lycourt-Donovan* is misplaced. In that case, we considered the sufficiency of the notice of appeal filed with *this court* under R.C. 4903.13, not whether alleged errors were preserved in the application for rehearing filed with *the commission* under R.C. 4903.10. Unlike R.C. 4903.10, R.C. 4903.13 does not contain a specificity requirement. Moreover, we have long held that the specificity test in R.C. 4903.10 is to be strictly construed. *See Discount Cellular*, 2007-Ohio-53, at ¶ 59; *see also Agin v. Pub. Util. Comm.*, 12 Ohio St.2d 97, 98 (1967) (a "casual similarity" between the grounds alleged on rehearing and the arguments in the appellant's brief does not satisfy the specificity requirements of R.C. 4903.10). In short, OCC is barred from arguing on appeal that the commission departed from the SEET Workshop case when it failed to give the commission an opportunity to consider the alleged error on rehearing. *See In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.*, 2014-Ohio-3764, ¶ 45.

{¶ 38} We now turn to OCC's three propositions of law.

### B. OCC Proposition of Law No. 1: The commission erred when it failed to order the return of significantly excessive earnings from the ESP to consumers

{¶ 39} OCC argues that the commission violated R.C. 4928.143(F) when it refused to order DP&L to return significantly excessive earnings from its ESP to consumers. We agree and reverse the commission on this issue.

#### 1. The commission's retrospective SEET determination

{¶ 40} The commission found that DP&L had excessive earnings of $3.7 million in 2018 and $57.4 million in 2019, amounting to a total of $61.1 million. The commission, however, determined that DP&L was not required to refund any excessive earnings to consumers, pointing to AES Corporation's capital commitments to DP&L to make "substantial capital expenditures" as part of its $267.6 million "Smart Grid Plan Phase 1" expenditures over a four-year period, "in addition to the AES [Corporation's] capital commitments to DP&L in the combined

amount of $300 million." PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 68 (June 16, 2021).

{¶ 41} As legal support, the commission cited the second sentence of R.C. 4928.143(F), which states that "[c]onsideration also shall be given to the capital requirements of [the utility's] future committed investments in this state." According to the commission, R.C. 4928.143(F) "does not specify a formula or the specific manner in which the Commission should consider future committed investments in this state." PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 68 (June 16, 2021). The commission found that "[g]iven the magnitude of the committed investment, . . . it is appropriate to offset, dollar-for-dollar, the excessive earnings against the future committed investment." *Id*. Accordingly, the commission offset the $61.1 million in excessive earnings against the $249 million in capital investments included within the $267.6 million of Smart Grid Plan Phase 1 expenditures. *Id*.

{¶ 42} On rehearing, the commission affirmed its decision to offset excessive earnings against future capital commitments. The commission reiterated its position that R.C. 4928.143(F) "provides the Commission broad discretion as to the manner in which it considers future capital commitments" and that "there is no legislative direction that requires that the consideration be limited to creating a slight adjustment in the SEET calculation," as OCC had claimed. PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 37 (Oct. 6, 2021); *see also* PUCO No. 18-1875-EL-GRD, Third rehearing entry, at ¶ 26-27 (Dec. 1, 2021).

**2. The plain language of R.C. 4928.143(F) does not support the commission's refusal to order the return of significantly excessive earnings**

{¶ 43} OCC's primary argument on appeal is that the plain language of R.C. 4928.143(F), which requires the commission to "also" give consideration "to the capital requirements of future committed investments," does not allow the commission to deny the return of significantly excessive earnings to consumers.

14

According to OCC, the first two sentences of R.C. 4928.143(F) establish the process for determining whether the utility has significantly excessive profits as measured by the earned return on equity. And if the commission determines that earnings are significantly excessive, the utility must return the excess amount to consumers.

{¶ 44} Conversely, the commission claims that the plain language of R.C. 4928.143(F) *requires* it to consider future capital requirements and that the statutory language does not specify *how* it is to consider those requirements. Therefore, the commission maintains, the "manner of consideration is left to the [c]ommission's discretion." Likewise, DP&L argues that the language of R.C. 4928.143(F) supports the commission's decision not to issue a refund.

{¶ 45} As with any question involving statutory construction, our analysis begins with the language of the statute. *See In re Application of Duke Energy Ohio, Inc.*, 2017-Ohio-5536, ¶ 19. R.C. 4928.143(F) requires the commission to consider each year whether an ESP "resulted in significantly excessive earnings" compared to companies facing "comparable" risk:

> With regard to the provisions that are included in an electric security plan under this section, the commission shall consider, following the end of each annual period of the plan, if any such adjustments resulted in excessive earnings as measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly traded companies, including utilities, that face comparable business and financial risk, with such adjustments for capital structure as may be appropriate. *Consideration also shall be given to the capital requirements of future committed investments in this state*.

(Emphasis added.) The utility bears the "burden of proof for demonstrating that significantly excessive earnings did not occur," and if the commission "finds that such adjustments, in the aggregate, did result in significantly excessive earnings, it shall require the electric distribution utility to return to consumers the amount of the excess by prospective adjustments." R.C. 4928.143(F).

{¶ 46} The first sentence of R.C. 4928.143(F) requires the commission to compare the electric utility's earnings with the earnings of publicly traded companies that are similar in terms of risk and capital structure. As part of this comparison, the commission must make numerous determinations, which include (1) calculating the utility's earned return on common equity, (2) identifying which publicly traded companies "face comparable business and financial risk," (3) computing such companies' return on common equity, and (4) deciding what "adjustments for capital structure [are] appropriate." *Id.*

{¶ 47} At issue here is the next sentence of R.C. 4928.143(F), which requires the commission to "also" give "[c]onsideration" to the "capital requirements of future committed investments in this state." The word "also" means "in the same manner as something else" or "in addition." *Webster's Third New International Dictionary* (2002). We read the word "also" to refer the reader back to the first sentence of R.C. 4928.143(F), which requires the commission to conduct the comparative analysis of the earnings of the electric utility and publicly traded companies that face comparable business and financial risk. After conducting the comparative analysis, the commission then determines whether the ESP's "adjustments, in the aggregate, did result in significantly excessive earnings." R.C. 4928.143(F). We find that by linking the second sentence to the first by use of the word "also," the General Assembly intended for the commission to "[c]onsider[] . . . the capital requirements of future committed investments in this state" as an *additional factor* that the commission must take into account *when*

conducting the comparative analysis to determine whether significantly excessive earnings exist.

{¶ 48} Contrary to the commission's determination, the consideration of capital requirements of future committed investments is not a separate step that the commission undertakes *after* conducting the comparative analysis to determine whether refunds of significantly excessive earnings are appropriate. Rather, it is part of the comparative analysis that the commission conducts *before* rendering a finding regarding significantly excessive earnings.

{¶ 49} This reading is bolstered by other language in R.C. 4928.143(F), which expressly forbids the retention of any "significantly excessive earnings" by mandating that upon such a finding, the commission "shall require the electric distribution utility to return to consumers the amount of the excess by prospective adjustments." Allowing the commission to instead offset significantly excessive earnings renders superfluous the mandatory language that requires the commission to order the return of such earnings to consumers.

{¶ 50} Finally, and most importantly, the word "offset" is noticeably absent from R.C. 4928.143(F). We must give effect to the words used in the statute and may not add to nor delete from the words chosen by the General Assembly. *Columbus S. Power Co.*, 2014-Ohio-462, at ¶ 26. Had the General Assembly intended to give the commission the authority to offset significantly excessive earnings against the electric utility's future committed investments, "it would have chosen words to that effect," *id*. The commission's determination therefore fell outside the parameters of R.C. 4928.143(F) and, in that regard, was unlawful.

### 3. The counterarguments of the commission and DP&L lack merit

{¶ 51} The commission and DP&L raise several counterarguments to OCC's plain-language claim. None has merit.

*a. The commission misconstrued the discretion afforded to it under*
*R.C. 4928.143(F)*

**{¶ 52}** As noted above, the commission reasoned that the lack of guidance under R.C. 4928.143(F) provides it with "broad discretion" to consider future capital commitments under the SEET, thereby allowing it to hold that refunding excessive earnings was not warranted here, given DP&L's commitment to make substantial capital investments in the future. PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 37 (Oct. 6, 2021); *see also* PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 68 (June 16, 2021); PUCO No. 18-1875-EL-GRD, Third rehearing entry, at ¶ 26-27 (Dec. 1, 2021). And in their respective briefs to this court, both the commission and DP&L argue that offsetting significantly excessive earnings against future capital commitments is consistent with the broad discretion purportedly granted to the commission under R.C. 4928.143(F).

**{¶ 53}** R.C. 4928.143(F) expressly requires the commission to consider the "capital requirements of future committed investments" in conducting the SEET. R.C. 4928.143(F), however, requires that this consideration take place within the context of comparing the earnings of the electric utility with similarly situated publicly traded companies. For this reason, the commission's discretion is confined to that part of the SEET. Therefore, when conducting the comparative analysis, the commission does have discretion to decide how to weigh the capital requirements of the utility's future committed investments. *See In re Application of Columbus S. Power Co.*, 2012-Ohio-5690, ¶ 36-38. Nonetheless, this discretion does not permit the commission to limit or eliminate refunds of significantly excessive earnings, because that would be contrary to the plain language of R.C. 4928.143(F).

**{¶ 54}** This reading of R.C. 4928.143(F) is consistent with our SEET precedent. For instance, in *Columbus S. Power*, 2012-Ohio-5690, we considered whether the commission had authority under R.C. 4928.143(F) to remove a certain category of revenue generated by "off-system sales," which are "wholesale sales

18

by the compan[y] to nonretail customers," from the earnings test *before* conducting the comparative analysis. *Columbus S. Power*, 2012-Ohio-5690, at ¶ 7, 35. We found that the first sentence of R.C. 4928.143(F) expressly required the commission to "find whether 'such adjustments'—referring to 'the provisions that are included in an electric security plan'—'*resulted* in excessive earnings.'" (Emphasis in original.) *Id.* at ¶ 40, quoting R.C. 4928.143(F). We stated that this implies that earnings not caused by the ESP may be excluded from consideration. Accordingly, we held that the commission's interpretation of R.C. 4928.143(F)—i.e., that it allows exclusion of revenue *not* resulting from the ESP—was reasonable, because it was implicitly supported by the statutory language and "no other part of the statute expressly contradict[ed] it." *Id.* at ¶ 39-40.

{¶ 55} Conversely, in *In re Determination of Existence of Significantly Excessive Earnings for 2017 Under the Elec. Sec. Plan of Ohio Edison Co.*, 2020-Ohio-5450, we reversed the commission's decision to exclude revenue from a utility's distribution-modernization rider from the SEET. We emphasized that the commission had cited no language in R.C. 4928.143(F) that would allow for the removal of this revenue from the earnings test. *Id.* at ¶ 20. And unlike *Columbus S. Power*, 2012-Ohio-5690, we declined to defer to the commission's justification for removing the revenue, because the statute did not implicitly support the decision to exclude the revenue from the SEET determination. *In re Determination of Existence of Significantly Excessive Earnings for 2017 Under the Elec. Sec. Plan of Ohio Edison Co.* at ¶ 20-21.

{¶ 56} In this case, the plain language of R.C. 4928.143(F) defeats any claim that the commission had authority to deny a refund of significantly excessive earnings that would otherwise be required by that provision. And no language in R.C. 4928.143(F) implicitly supported the commission's decision, while other parts of the statute expressly contradicted it. Accordingly, we do not agree with the commission's interpretation of R.C. 4928.143(F).

*b.  DP&L and the commission incorrectly claim that the commission made no finding of significantly excessive earnings*

{¶ 57} DP&L and the commission both claim that the commission was not required to order a refund because it never made a finding that significantly excessive earnings occurred in this case.  We reject this claim.

{¶ 58} First, the commission expressly found that DP&L's earnings for 2018 and 2019 were above the SEET threshold, which is the point above which earnings are considered significantly excessive.  *See Ohio Edison Co.*, 2020-Ohio-5450, at ¶ 56 ("an appropriate SEET threshold . . . is the point above which earnings are considered significantly excessive").  Second, both DP&L and the commission concede that the commission offset earnings *above the SEET threshold*.  And third, neither party explains why it was necessary for the commission "to offset, dollar-for-dollar," total earnings in the amount of $61.1 million against DP&L's future committed investments if those earnings were not significantly excessive.

*c.  The commission cannot circumvent the law to achieve state policy goals*

{¶ 59} In addition to relying on the "consideration" sentence in R.C. 4928.143(F), the commission found that offsetting DP&L's excessive earnings against future capital investments in this case is consistent with state policy under R.C. 4928.02(D), which is to "[e]ncourage innovation and market access for cost-effective supply- and demand-side retail electric service including, but not limited to, demand-side management, . . . smart grid programs, and implementation of advanced metering infrastructure."  *See* PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 68 (June 16, 2021); PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 37 (Oct. 6, 2021).  The commission argues that we should defer to its judgment in directing how significantly excessive earnings should be accounted for, asserting that the General Assembly has left it to the commission's discretion to decide how best to achieve the policy goals set forth in R.C. 4928.02.

{¶ 60} The policy statements in R.C. 4928.02 are merely "'guideline[s] for the commission to weigh'" in evaluating whether a utility's services and programs further state policy goals. *In re Application of Columbus S. Power Co.*, 2011-Ohio-1788, ¶ 62, quoting *Ohio Consumer's Counsel v. Pub. Util. Comm.*, 2010-Ohio-134, ¶ 39. And while the commission has discretion on how best to achieve these policy goals, it cannot rely on R.C. 4928.02(D) to justify the retention of significantly excessive earnings. The commission is a "'creature of statute'" and may act only under the authority conferred on it by the General Assembly. *In re Application of Ohio Edison Co.*, 2019-Ohio-4196, ¶ 17, quoting *Discount Cellular*, 2007-Ohio-53, at ¶ 51. The commission's desire to advance the state policy set out in R.C. 4928.02 "does not empower [it] to create remedies beyond the parameters of the law," *Indus. Energy Users-Ohio v. Pub. Util. Comm.*, 2008-Ohio-990, ¶ 23. In other words, the general policy statement in R.C. 4928.02(D) cannot be used to override the plain language of R.C. 4928.143(F) requiring the commission to order a refund of significantly excessive earnings.

*d. DP&L and the commission misconstrue the meaning of the term "such adjustments, in the aggregate" in R.C. 4928.143(F)*

{¶ 61} DP&L, quoting R.C. 4928.143(F), argues that the provision requires a refund to consumers "only if [the commission finds that] 'such adjustments, in the aggregate, did result in significantly excessive earnings.'" According to DP&L, "[t]he phrase 'such adjustments' refers to the adjustments included earlier in the paragraph, including the 'Consideration' sentence."

{¶ 62} The commission similarly maintains that it simply followed the plain language of R.C. 4928.143(F), which requires it to determine if "such adjustments, in the aggregate, did result in significantly excessive earnings." According to the commission, it was required to consider the future-committed-investments language in the aggregate—or together, as a whole—with the return-on-equity and

comparable-company analysis in the first sentence of R.C. 4928.143(F) to determine whether significantly excessive earnings occurred.

{¶ 63} To begin with, the plain-language argument asserted by DP&L and the commission runs counter to earlier arguments that we should defer to the commission's interpretation of R.C. 4928.143(F). And in any event, the commission did not rely on the "in the aggregate" clause in refusing to order a return of excessive earnings. We therefore reject the arguments on that basis. *See In re Application of Duke Energy Ohio, Inc., for Approval of its Fourth Amended Corporate Separation Plan*, 2016-Ohio-7535, ¶ 23-26 (observing that the rationale advanced by the commission in its order establishes the boundaries of our review on appeal).

### e. DP&L's financial-condition claim lacks statutory support

{¶ 64} DP&L claims that the commission's application of R.C. 4928.143(F) was reasonable and supported by the evidence. DP&L notes that the commission found that "ordering refunds of excess earnings would not only preclude the future grid modernization that [the commission had] approved, but it would also strain [DP&L's] ability to maintain its distribution and transmission systems," PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 40 (Oct. 6, 2021).

{¶ 65} The commission found on rehearing that, consistent with its obligation to consider the capital requirements of future committed investments, DP&L's financial condition supported the retention of excess earnings in this case. *See* PUCO case No. 18-1875-EL-GRD, Third rehearing entry, at ¶ 26-27 (Dec. 1, 2021). Specifically, the commission found that ordering customer refunds of excess earnings to reduce DP&L's future recovery of capital expenses would impair the company's ability to fund its grid-modernization project and maintain its distribution and transmission systems. *Id*. at ¶ 27; *see also* PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 40 (Oct. 6, 2021).

{¶ 66} The commission erred because R.C. 4928.143(F) expressly prohibits the commission from authorizing the retention of significantly excessive earnings, and it contains no exception based on the electric utility's financial condition or future capital investments.

### 4. Conclusion to OCC Proposition of Law No. 1

{¶ 67} In sum, no language in R.C. 4928.143(F) authorized the commission to allow DP&L to retain significantly excessive earnings from its ESP based on a commitment to make future investments. Therefore, we reverse the commission with respect to this determination and remand this matter to the commission for further proceedings. On remand, the commission is instructed to conduct a new SEET analysis in which it considers the capital requirements of DP&L's future committed investments solely within the context of the comparative-earnings analysis required by R.C. 4928.143(F).

### C. OCC Proposition of Law Nos. 2 and 3: Did the commission err when it allowed DP&L to continue collecting the rate-stability charge from customers?

{¶ 68} In proposition of law No. 2, OCC argues that the commission erred when it allowed DP&L to continue collecting the rate-stability charge as part of the settlement in this case. OCC specifically challenges the commission's finding that the rate-stability charge relates to DP&L's continuing obligation to operate as a provider of last resort.[4] *See* PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 57 (June 16, 2021). According to OCC, the commission violated R.C. 4903.09 and this court's precedent when it failed to cite any record evidence of the costs that DP&L incurs to provide provider-of-last-resort service.

---

4. Provider-of-last-resort costs are intended to compensate an electric-distribution utility for "risks in standing ready to serve customers who purchase generation service from a competitive supplier and then return to the utility for generation service." *Columbus S. Power Co.*, 2014-Ohio-462, at ¶ 8.

**{¶ 69}** Relatedly, in proposition of law No. 3, OCC argues that the rate-stability charge is an "unlawful financial integrity charge to consumers" and, as such, is not a permissible provision of an ESP under R.C. 4928.143(B)(2). According to OCC, the commission failed to identify any costs that DP&L incurs related to the rate-stability charge and therefore the charge cannot be justified under R.C. 4928.143.

**{¶ 70}** OCC's second and third propositions of law hinge on an incorrect premise—namely, that the commission approved the rate-stability charge or otherwise authorized its continued use when it approved the agreed stipulation in this case. The commission allowed DP&L to continue charging the rate-stability charge in the company's first ESP case, PUCO case No. 08-1094-EL-SSO, not in the cases currently on appeal. The rate-stability charge is a provision of DP&L's first ESP. As discussed above, in 2019, the commission issued an order allowing DP&L to reinstate ESP I—including the rate-stability charge—following the company's withdrawal of ESP III. *See ESP I Order* at ¶ 27-29.

**{¶ 71}** OCC has since appealed the commission's order reinstating ESP I when it filed an appeal in case No. 2023-0130 and when it filed a cross-appeal in case No. 2023-0111. And in those cases, OCC has raised legal challenges against the validity of the rate-stability charge. Therefore, the issues involving the rate-stability charge are properly before this court in those cases, and we will address OCC's challenges to the rate-stability charge in those consolidated appeals.

### D. DP&L's cross-appeal

**{¶ 72}** DP&L asserts in its cross-appeal that the commission erred by failing to find that DP&L passed the SEET on alternative grounds. According to DP&L, even if this court rejects the commission's determination that R.C. 4928.143(F) allows for an offset of significantly excessive earnings, we should nevertheless conclude that DP&L passed the SEET based on alternative grounds that DP&L raises for affirming the commission's order.

**1. Notice of appeal—Rule 3.11(D)(2)**

{¶ 73} As an initial matter, in response to DP&L's cross-appeal, the commission argues that the cross-appeal should be dismissed because DP&L failed to comply with Rule 3.11(D)(2) of the Rules of Practice of the Supreme Court of Ohio, which states that "the notice of appeal shall also contain a certificate of filing to demonstrate that the appellant filed a notice of appeal with the docketing division of the Public Utilities Commission."

{¶ 74} DP&L does not dispute that it did not comply with the requirements of Rule 3.11(D)(2), and we have previously stricken a notice of appeal on this basis, *see Ohio Consumers' Counsel v. Pub. Util. Comm.*, 2005-Ohio-1023, ¶ 2-3 (applying the same filing requirements previously set forth in former Rule XIV(2)(C)(2)). However, Rule 3.11(D)(2) applies only when a party must appeal from the commission's order to present its arguments. And whether a party is required to appeal the commission's final order to put that party's arguments before the court turns on whether R.C. 4903.13 applies.

{¶ 75} R.C. 4903.13 provides:

> The proceeding to obtain such *reversal, vacation, or modification* [of a final order of the commission] shall be by notice of appeal, filed with the public utilities commission by any party to the proceeding before it, against the commission, setting forth the order appealed from and the errors complained of. The notice of appeal shall be served, unless waived, upon the chairman of the commission, or, in the event of his absence, upon any public utilities commissioner, or by leaving a copy at the office of the commission at Columbus.

(Emphasis added.)

{¶ 76} R.C. 4903.13 contains both filing and service requirements that apply when a party wishes to reverse, vacate, or modify the commission's final order. But that is not what DP&L is attempting to do here. Rather, it seeks to assert alternative grounds for *affirming* the commission's final order. So, under the plain language of R.C. 4903.13, DP&L was not required to file a protective cross-appeal to advance its arguments for affirming the commission's final order. And because R.C. 4903.13 does not apply, neither does Rule 3.11(D)(2). We will therefore address DP&L's cross-appeal arguments in support of the commission's order.

## 2. DP&L's alternative grounds for affirmance

{¶ 77} In its first cross-appeal issue, DP&L states that if this court rejects the commission's determination that the "consideration" sentence in R.C. 4928.143(F) allows for an offset of significantly excessive earnings, we should nevertheless conclude that DP&L passed the SEET for the following reasons: (1) DP&L's write-off of $1 billion of asset value between 2012 and 2016 should have been included in the commission's SEET calculation, (2) DP&L's distribution-modernization rider should have been excluded from the commission's SEET calculation, (3) AES Corporation's $300 million equity investment and certain federal-tax-law changes should have been considered in the commission's SEET calculation, and (4) the rate-stabilization charge should be excluded from DP&L's earnings.

{¶ 78} In its second cross-appeal issue, DP&L argues that the commission erred by failing to expressly rule, as an additional ground in support of its order, that R.C. 4928.143(C)(2)(b) required the commission to reinstate the rate-stabilization charge when DP&L was permitted to return to ESP I after the termination of ESP III.

{¶ 79} For the reasons that follow, neither issue raised in DP&L's cross-appeal warrants affirming the commission's order on alternative grounds.

*a. Additional grounds for finding that DP&L passed the SEET*

{¶ 80} First, DP&L argues on cross-appeal that the commission did not offer any explanation for why it refused to consider the company's $1 billion write-off of asset value in the SEET calculation. Although not cited by DP&L, R.C. 4903.09 requires the commission to set forth the reasons for its decisions and prohibits summary rulings and conclusions that do not develop the supporting rationale or record. *See Indus. Energy Users-Ohio*, 2008-Ohio-990, at ¶ 30.

{¶ 81} However, contrary to DP&L's assertion, the commission did offer an explanation on this matter. Specifically, the commission declined to consider DP&L's $1 billion write-off because the commission had already used a hypothetical capital structure in setting the appropriate SEET threshold. *See* PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 50 (Oct. 6, 2021); PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 62, 66 (June 16, 2021). Therefore, the commission did not err by failing to include DP&L's write-off of assets in the SEET calculation.

{¶ 82} Second, DP&L argues that the distribution-modernization rider should have been excluded from the SEET calculation because it is not an "earned return" under R.C. 4928.143(F) due to the significant restrictions placed on the company's use of distribution-modernization rider revenues. According to DP&L, these restrictions make its rider distinct from FirstEnergy's distribution-modernization rider, which this court invalidated in *Ohio Edison*, 2019-Ohio-2401. And because the riders are legally distinct, DP&L contends that its distribution-modernization rider revenue was not an earned return and thus is excludable from the SEET. Similarly, DP&L argues that because its distribution-modernization-rider revenues were restricted such that they could be used only to pay and reduce the company's debt and alter its capital structure, the rider should be excluded from the company's earned return as a capital charge.

{¶ 83} Each of these arguments was rejected by the commission because (1) the commission had already determined in the "ESP III case" that DP&L's distribution-modernization rider was "fundamentally similar" to FirstEnergy's rider, *see In re Application of Dayton Power & Light Co. to Establish a Std. Serv. Offer in the Form of an Elec. Sec. Plan*, PUCO No. 16-395-EL-SSO, Supplemental opinion and order, ¶ 107-110 (Nov. 21, 2019); (2) "all ESP charges count toward a utility's overall earnings"; and (3) distribution-modernization-rider revenues are earnings and thus subject to inclusion in the SEET. PUCO No. 18-1875-EL-GRD, Opinion and order, at ¶ 65 (June 16, 2021); PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 49 (Oct. 6, 2021).

{¶ 84} Even so, in support of its argument that the distribution-modernization rider should be excluded, DP&L cites the lead opinion in *Ohio Edison* for the proposition that commission-imposed restrictions on the use of distribution-modernization-rider revenues affect whether those proceeds are deemed "earned returns" for purposes of the SEET. Contrary to DP&L's contention, however, this court never said in *Ohio Edison* that restrictions on distribution-modernization-rider revenues affect earnings for SEET purposes. The lead opinion did discuss commission-imposed restrictions on the receipt of distribution-modernization-rider funds, but it did so only in the context of determining the legality of Ohio Edison's distribution-modernization rider. *Ohio Edison* at ¶ 20-23 (lead opinion). DP&L ignores that the lead opinion in *Ohio Edison* expressly refused to consider whether distribution-modernization-rider revenues should be included in the SEET determination, *see id*. at ¶ 32-34.

{¶ 85} DP&L further contends that its distribution-modernization rider should be excluded from the SEET as an extraordinary and one-time item in the company's ESP III, *see* PUCO No. 09-786-EL-UNC, 2010 Ohio PUC LEXIS 707, at *40 (June 30, 2010) (the commission may exclude "non-recurring, special, and

extraordinary items" from the ESP when conducting the SEET). DP&L raises two arguments in support of this contention. Neither one has merit.

{¶ 86} DP&L initially asserts that the distribution-modernization rider should be excluded from the SEET determination because it constituted a special or extraordinary item from the company's ESP III. DP&L claims that its rider was unique because it is "materially different" from the distribution-modernization rider of FirstEnergy, the only other utility in Ohio that had a similar rider. But, as already discussed, the commission had previously determined in the ESP III case that DP&L's distribution-modernization rider was substantially the same as FirstEnergy's rider. DP&L simply repeats the same argument here that it made on rehearing before the commission. Hence, DP&L fails to rebut the commission's determination that its distribution-modernization rider was substantially similar to FirstEnergy's rider.

{¶ 87} Additionally, DP&L maintains that the distribution-modernization rider constituted a "non-recurring" item under ESP III. DP&L contends that the distribution-modernization rider was non-recurring because it was scheduled to last three years, but the commission terminated it before those three years had passed. With this in mind, DP&L proposes that it be allowed to retain all its earnings from the distribution-modernization rider while it was in place, but it would deny the commission authority to consider those earnings as part of the SEET because the commission later found the distribution-modernization rider to be unlawful. While such an approach would certainly be agreeable to DP&L, the company cites no authority for the proposition that the commission has defined "non-recurring" in this way.

{¶ 88} Therefore, DP&L has failed to demonstrate that the commission erred by not excluding the distribution-modernization rider from the SEET calculation.

{¶ 89} Third, DP&L claims that the commission should have adjusted the SEET calculation to account for (1) a $300 million equity investment during the period of 2020 to 2021 from its parent corporation, AES Corporation, and (2) certain tax-law changes. The commission rejected DP&L's claim regarding the investment from AES Corporation, because the commission had already considered the overall benefits of these additional investments in conducting the SEET when it offset $61.1 million of DP&L's significantly excessive earnings instead of ordering a refund of that amount to consumers. *See* PUCO No. 18-1875-EL-GRD, Second rehearing entry, at ¶ 50 (Oct. 6, 2021). The commission also determined that DP&L was not entitled to an $18 million earnings adjustment "to account for tax law changes that were realized in 2019," finding that the tax-law changes were "not an extraordinary event" that warranted the requested income adjustment. *Id*. at ¶ 51. DP&L does not coherently explain how the commission erred on these issues; DP&L relies solely on witness testimony to support its arguments, yet it never explains how that testimony undermines the commission's determinations. Therefore, DP&L has failed to demonstrate that the commission erred by not considering AES Corporation's equity investments and tax-law changes in the SEET calculation.

{¶ 90} Fourth, DP&L argues that the distribution-modernization-rider amounts that are included as income for SEET purposes should be offset by the rate-stabilization-charge amounts that the company would have received pursuant to its return to ESP I and that those rate-stabilization-charge amounts should be excluded from earnings.

{¶ 91} The commission rejected this argument in its second rehearing entry. It found that nearly all distribution-modernization-rider amounts at issue were not recovered as rate-stabilization-charge amounts and therefore, it refused to reclassify them for SEET purposes. *Id*. And the commission stated that even assuming such

a reclassification were appropriate, rate-stabilization-charge revenues are still considered earnings for SEET purposes. *Id.*

{¶ 92} DP&L's sole challenge on cross-appeal for excluding the rate-stabilization charge from the SEET calculation is that the commission's determination on rehearing misstated DP&L's argument. But in its appeal to this court, DP&L does not argue against the commission's determination that nearly all amounts at issue were not recovered as rate-stabilization-charge revenues or its determination that rate-stabilization-charge revenues are considered earnings for SEET purposes. Therefore, DP&L has failed to demonstrate that the commission erred by not excluding the rate-stabilization-charge amounts from earnings.

*b. Additional ground for reinstatement of rate-stabilization charge following termination of ESP III*

{¶ 93} In its second cross-appeal issue, DP&L alleges that the commission should have expressly ruled that R.C. 4928.143(C)(2)(b) required the commission to reinstate the rate-stabilization charge after DP&L terminated ESP III and was allowed to return to ESP I, *see ESP I Order* at ¶ 27.

{¶ 94} In its second rehearing entry, the commission rejected DP&L's request to adopt an additional reason to uphold the lawfulness of the rate-stabilization charge, because it had thoroughly considered the legality of the rate-stabilization charge when it allowed DP&L to return to ESP I in December 2019, *see* PUCO No. 18-1875-EL-GRD, Second rehearing entry, ¶ 52 (Oct. 6, 2021). In its cross-appeal, DP&L offers no argument as to *why* the commission needed to make an express ruling about an additional basis for reinstating the rate-stabilization charge in this case when it had already provided ample reasoning in support of that determination when allowing DP&L to return to ESP I, *see ESP I Order* at ¶ 27-35. Hence, the commission did not err by not expressly ruling on the reinstatement of the rate-stabilization charge under R.C. 4928.143(C)(2)(b).

{¶ 95} In short, DP&L's cross-appeal offers no valid alternative ground for affirming the commission's order. And DP&L has provided no reason to disturb the commission's rejection of the company's alternative grounds for affirmance in the proceedings below.

### 3. Cross-appeal unnecessary to assert alternative grounds to affirm commission's order

{¶ 96} Lastly, DP&L seeks "clarity" as to how it may put alternative arguments for affirming the commission's order before this court. Citing our decision in *Ohio Edison Co.*, 2020-Ohio-5450, at ¶ 41, 47, DP&L claims that this court recently refused to consider arguments that a utility made as alternative grounds for affirmance because the commission had not decided the case on those grounds.

{¶ 97} Initially, *Ohio Edison Co.* did not receive four votes in support of its reasoning, so there is no holding that is binding on this court, *see Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 2012-Ohio-5017, ¶ 29. And the sole case cited by the lead opinion in *Ohio Edison Co.* does not support the lead opinion's assertion that there is a "practice" of this court "not to uphold a commission's decision based on a justification asserted by a party on appeal that is different from the justification the commission provided in its order." *Ohio Edison Co.* at ¶ 47 (lead opinion), citing *Duke Energy Ohio*, 2016-Ohio-7535, at ¶ 23-26. Rather, *Duke Energy Ohio* explained that the commission's counsel could not "recast the commission's decision to be something that it is not." *Duke Energy Ohio* at ¶ 26. That is, the commission could not change its rationale for its decision in appellate briefing. *Id.* at ¶ 24. And in any case, to the extent that *Duke Energy Ohio* can be read for the proposition that there is a *practice* that parties cannot defend a commission's order on alternative grounds, we disavow it. An appellee may defend a lower tribunal's decision by asserting alternative grounds for affirmance than those adopted by the tribunal, without having to file a protective cross-appeal. *See generally Fedor v.*

*United Healthcare, Inc.*, 976 F.3d 1100, 1107 (10th Cir. 2020), quoting *United States v. Madrid*, 633 F.3d 1222, 1225 (10th Cir. 2011) ("While an appellee can generally seek affirmance on any ground found in the record, it must file a cross-appeal if it seeks to enlarge its rights and gain "'more than it obtained by the lower-court judgment.'").

## IV. CONCLUSION

**{¶ 98}** For the foregoing reasons, we reverse the commission's determination allowing DP&L to retain significantly excessive earnings in this case and remand this matter to the commission for further consideration. On remand, the commission shall conduct a new SEET analysis that considers the capital requirements of DP&L's future committed investments within the context of the comparative analysis required by R.C. 4928.143(F). We reject OCC's remaining arguments, and we also reject DP&L's cross-appeal arguments seeking to affirm the commission's order on alternative grounds.

Orders reversed

and cause remanded.

––––––––––––––––––

Christopher C. Hollon; and Faruki, P.L.L., Jeffrey S. Sharkey, D. Jeffrey Ireland, Jeffrey T. Cox, and Melissa L. Watt, for appellee and cross-appellant, Dayton Power & Light Company, d.b.a. AES Ohio.

Maureen R. Willis, Ohio Consumers' Counsel, Angela D. O'Brien, Deputy Consumers' Counsel, and William J. Michael, Assistant Consumers' Counsel, for appellant and cross-appellee, Office of Ohio Consumers' Counsel.

Dave Yost, Attorney General, and John H. Jones, Thomas G. Lindgren, and Robert A. Eubanks, Assistant Attorneys General, for appellee and cross-appellee, Public Utilities Commission of Ohio.

––––––––––––––––––